## THE BALTIMORE TRANSIT COMPANY
### *v.* SMITH

[No. 55, September Term, 1968.]

*Decided February 13, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, McWILLIAMS, FINAN and SMITH, JJ.

*Edward J. Thompson* for appellant.

*William E. Chamberlain,* with whom were *Ginsberg & Ginsberg* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Shocked by the jury's verdict, $35,000, Judge MacDaniel declared he would grant appellant's motion for a new trial unless appellee (Smith) filed a remittitur of $20,000. Smith refused and appealed to this Court. We dismissed his appeal. After further argument in the court below Judge MacDaniel, somewhat recovered from his initial shock, reduced the remittitur to $15,000. Believing a new trial would "present a direct and unwarranted hazard to * * * [his] physical health and emotional stability" Smith remitted the $15,000. The remittitur, however, failed to assuage appellant's state of shock and it now urges us to overturn the $20,000 judgment against it and remand the case for a new trial.

The error assigned arises out of Judge MacDaniel's refusal to strike the testimony of Dr. Krejci who "directly or indirectly * * * relate[d] all of Mr. Smith's complaints to his injury." Appellant contends the doctor's testimony is insufficient to establish a causal connection between the accident and Smith's injuries or that the injuries are permanent. It contends also there is nothing to show that Smith's lower back and leg complaints resulted from the accident. The contention that another witness (Kardash) failed to qualify as an expert was abandoned at argument.

At 8:30 a.m. on 28 January 1965, at an intersection in Baltimore City, the right rear of Smith's car was struck by the front of appellant's bus. He "was snapped back and forth violently." Smith, 59 years old at the time, was employed as a part-time truck driver. At divers times in his career he had worked as a bookbinder and as a refrigeration mechanic. Phi-

lately is his hobby and, for some time before the accident, he had been trying to make it produce some income.

Following the accident he was "dazed and excited and nervous." He did not see a doctor right away because he "did not feel that * * * [he] was injured. [He] thought it was just a little shaking up and that would wear off." He said he took "various [home] remedies * * * to kill pain and [that he] tried to rest as much as possible." Two or three months later when he "finally could afford to go see a doctor" he consulted Dr. Samuel Legum who prescribed and administered heat treatments. His wife massaged him from time to time. He kept on working, he said, thinking he "could work it off [and that] everything would go back to normal" but he "kept steadily getting worse." He said he found he "couldn't sit erect or drive for more than approximately two hours without the pain getting so great that * * * [he] would have to stop the truck and get out and lay [sic] on the lawn or something to relieve the pain in * * * [his] back." In December 1965 he went to Dr. Krejci who referred him to Mr. Mand, a physical therapist. He visited Mr. Mand 14 or 15 times to receive heat treatments and massage. He saw Dr. Krejci two or three times altogether.

At trial Smith testified he was "a walking corpse," that he was in constant pain and that his left side, left arm and left leg felt numb. He said he complained to Dr. Krejci of pain in his legs and in the lower part of his body. While in the military service, before the accident, he suffered from "shortness of breath" and "a nervous heart." He was discharged for "psychoneurosis."

Dr. Krejci was produced as a witness for Smith. His qualifications to give expert testimony were not challenged. We have set forth below the pertinent portions of his testimony:

"Q. All right, read that. A. When I first saw Mr. Smith on December 13, 1965 he gave the history of having been injured in an automobile accident, and he gave the date as January 25, 1965, but he was not sure. He gave the location of the accident. He stated he was driving on his way to work and was making a right-hand turn when his car was struck in the rear

by a bus, and that his left front wheel struck the curb, and that he was wearing a seat belt at the time. He recalled that at the impact he was pushed to the left and his head snapped, that within the next two days the back of his neck on the left side, low, pained and he used the word grated. He then developed a headache in the back of the head on the left side, and he recalled that sudden rotation of his neck to the left caused pain in the back of the neck on the left side. The patient went to a Dr. Legum, and I don't know the exact date of that treatment. He said that he had received four heat treatments. When I first saw Mr. Smith, 11 months after injury, he complained of headaches in the back of the head on the left and sharp pain going up the back of his neck to the base of the skull. He also complained of diminished acuity in hearing on the left side. He was partially deaf in the left ear and had difficulty with vision in his left eye. He complained of pain in the back of the neck on the left and the grating was still present. He said that he was unable to rotate his head well to the left and that rotation to the left caused pain. He also complained of pain in the front and side aspects of his left upper arm and forearm and stated that his left hand cramped. He described soreness in the front of the chest on the left side along with difficulty in breathing. He said that he was unable to stay erect for longer than four hours at a time because of pain which went across the lower part of his upper back below the lower angles of his shoulder blades. At that point I examined him."

Dr. Krejci related in considerable detail what his examination of Smith disclosed. He said he saw him again in September 1967. The doctor's testimony continues:

"In September 1967, as compared to December of 1965 and January of 1966, I was not pleased with the patient's emotional state. He seemed depressed. He again at the base, going across to the apices of the shoulder was complaining of pain in the back of his neck, low

and down both arms, especially the left arm. Now he complained of low back pain, especially on the left side, and pain in the left thigh and calf."

* * *

"Doctor, are you able to relate with a reasonable medical certainty any of the complaints given by Mr. Smith to you during examination to the injury that he recited to you that he sustained on January 28, 1965?
"(Mr. Thompson) Objection.
"(The Court) Overruled.
"A. Yes sir.
"Q. Would you be kind enough to tell us what you have been able to determine in that respect?
"A. Before I am able to answer that question—
"(Mr. Thompson) Objection, your Honor.
"(The Court) You can't ask any question, Doctor. Just answer the question to the best of your ability.
"(The Witness) I can't, your Honor.
"(The Court) You may ask him another question, Mr. Chamberlain.
"By Mr. Chamberlain.
"Q. What complaints, if any, Doctor, are you able to relate with reasonable medical certainty to the injury that Mr. Smith gave you in his history?
"(Mr. Thompson) Objection.
"(The Court) Overruled.
"A. *Directly or indirectly I can relate all of Mr. Smith's complaints to his injury with the exception of his visual disturbance.* [Emphasis added.]
"(Mr. Thompson) Object to the answer and move it be stricken, your Honor.
"(The Court) Overruled. You may proceed.
"Q. Doctor, you said directly. What direct consequence can you attribute to this accident as a result of your observation?
"A. By history, by recollection, by physical examination, by past history, I would give the opinion that the patient's left ear symptom, headache, neck pain, and limitation of motion, front chest pain on the left side.

left arm symptoms, and upper back symptoms are directly related to his injury of January 1965.

"Q. Doctor, as of the last time you examined Mr. Smith, is it your medical opinion that further treatment might improve these things that you describe. A. It is my opinion further treatment would improve him.

"Q. Is it medically possible for you to determine whether this man would be made whole again completely as a result of these treatments?

"(Mr. Thompson) Objection, your Honor.

"(The Court) Overruled.

"A. Considering the length of time since injury and the sporadic nature of his treatment over that long period of time, it is my opinion anyone would be optimistic if one were to foresee a one hundred per cent result, but it is also my opinion that the patient would get very significant improvement if he could have prolonged, intensive physical therapy from an expert professional physical therapist."

What follows is an excerpt from the cross-examination of Dr. Krejci:

"Q. Then how can you compare his condition that you found on that examination regarding the injury to his muscles with the condition that he may have had before this accident? A. One, by history. The patient did not volunteer or upon questioning give any previous treatment for musculoskeletal disability such as these. Number two, the type of injury which he gave was consistent with the complaints which he had the first time I saw him. Number three, beginning with his injury he sought treatment and his complaints were consistent up until the time I saw him. And, number four, his complaints were amply corroborated by the physical findings which I found, his subjective complaints and his objective physical findings were consistent."

## I.

Appellant contends that since Smith never revealed to Dr. Krejci his condition prior to the accident no proper foundation was laid which would enable the doctor to establish a causal connection between Smith's complaints and the accident. Therefore, it argues, it was error not to strike Dr. Krejci's testimony from the record. We disagree. It was shown that Dr. Krejci had been approached by Smith for treatment. At trial Dr. Krejci qualified as an expert witness. Through personal examination he had knowledge of Smith's injuries. Had he failed to consider any essential facts in forming his opinion as to the cause of the injuries, then the weight of his testimony might be weakened, but its admissibility would not have been destroyed.

What was said in *Marshall v. Sellers,* 188 Md. 508, 518, 53 A. 2d 5 (1947) is apposite here:

> "Where a physician is familiar with the facts of an accident and the nature of the injuries, he is competent to testify as to whether the injuries were caused by the accident, although the facts in evidence are not recounted to him in a hypothetical question before he expresses his opinion. The details which the expert has personally observed can be elicited on either direct or cross-examination, and these details can be associated with the other grounds for the general conclusion; and *if it is discovered that any essential facts have been overlooked, the weight of his opinion will thereby be weakened or destroyed.* The opinion of an expert witness, the grounds upon which it has been formed, and the *weight to be accorded to it are all matters for the consideration of the jury.* * * * In *Baltimore City Passenger Ry. Co. v. Tanner,* 90 Md. 315, 45 A. 188, where the plaintiff sought damages against the railway company for injuries sustained by him when a railway car ran into his wagon, and he was thrown out of the wagon and fell upon his side and head, this Court held that a medical witness, who heard the plaintiff narrate on the witness stand the

facts of the accident, was qualified to state whether or not the deafness in the plaintiff's left ear was the natural and probable result of the accident." (Emphasis added.)

To the same effect *see Starr v. Oriole Cafeterias, Inc.,* 182 Md. 214, 34 A. 2d 335 (1943); *Langenfelder v. Thompson,* 179 Md. 502, 20 A. 2d 491 (1941).

In *Montgomery Ward & Co. v. Cooper,* 248 Md. 536, 237 A. 2d 753 (1968), we affirmed the lower court's decision permitting a doctor to testify in respect of the cause of plaintiff's injuries. The doctor had been her treating physician. He also had been her doctor prior to the accident. Judge Barnes, for the Court, said:

"In considering the admissibility of plaintiff's exhibit No. 3 [hospitalization charges] and the causal connection of the services set forth on that exhibit and the accident of April 13, 1963, the test to be applied was stated by Judge (later Chief Judge) Prescott in *Ager v. Baltimore Transit Company,* 213 Md. 414, 421, 132 A. 2d 469, 473 (1957), as follows:

'Maryland cases, in accord with these well-recognized and established principles are all consistent in rejecting the proposition that the jury may form a judgment or conclusion on the basis of testimony which admits of mere possibilities and have stated in various cases that the test to be applied, whether the question involved is the existence of an injury or its cause is reasonable probability or reasonable certainty. . . .'

"In our opinion, taking Dr. Young's testimony as a whole, it would permit the jury to find the hospital services listed on plaintiff's exhibit No. 3 resulted from the accident." *Id.* at 541-42.

\* \* \*

"In *Hughes v. Carter,* 236 Md. 484, 204 A. 2d 566 (1964), which involved a question of the causal relationship of a condition of pneumonia to an automobile accident, the attending physician, called by the

plaintiff, was far from positive in his testimony in regard to the causal connection. He first said that such causal relationship 'was possible,' then that 'it was probable' and finally that he would not 'pin it down' but 'thought it was possible.' We held in *Hughes* that there was sufficient evidence of a causal connection to be submitted to the jury. It seems apparent that if the attending physician's testimony in *Hughes* was sufficient evidence of causal connection, Dr. Young's testimony in the present case is quite sufficient. . . ." *Id.* at 543.

And similarly, in the case at bar, Dr. Krejci's testimony positively relating Smith's injuries to the accident was sufficient evidence of causal connection. In *Montgomery Ward & Co. v. Cooper,* we said that Montgomery Ward had the right to show by medical testimony that the conditions complained of were not caused by the accident, but since it did not produce any such testimony the doctor's testimony stood uncontradicted. In the instant case, it will be remembered, appellant, perhaps with reason, did not call Dr. Legum to testify nor did it undertake to produce the testimony of its own doctors.

## II.

Appellant contends Judge MacDaniel erred in refusing to instruct the jury not to consider any complaints made by the plaintiff regarding his lower back or legs because there was no medical testimony that these complaints were the result of injuries sustained in the accident. This argument, however, is without merit since Dr. Krejci testified that Smith had complained to him of pain in the low back and legs and said that "directly or indirectly * * * [he could] relate *all* of Mr. Smith's complaints to his injury with the exception of his visual disturbance." (Emphasis added.)

## III.

Appellant contends finally that Judge MacDaniel erred in failing "to instruct the jury that they were not to consider the injuries of the plaintiff as permanent, for the reason there is

insufficient evidence to show the injuries referred to are in fact permanent." On this point the court had said to the jury:

"You should consider as to whether or not the injuries that he complains of are permanent and how far they will go to prevent him from engaging in those activities and occupations for which in the absence of such injuries he may have been capable of engaging."

In *Baer Bros., Inc. v. Keller,* 208 Md. 556, 558, 119 A. 2d 410 (1956), which we think is controlling, it was said:

"In deciding whether the jury should be instructed that there was no evidence from which they could find that the appellee had suffered permanent injuries, the Court should resolve all conflicts in the evidence in favor of the appellee [plaintiff] and should assume the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the appellee's right to recover."

The Court in *Baer Bros.* then discussed a number of cases involving jury instructions on the permanency of injuries. It quoted at 565-66 *Alabama Great Southern R. Co. v. Taylor,* 196 Ala. 37, 71 So. 676:

"[A]pproximately nine months after the plaintiff was injured there was testimony tending to show that plaintiff was physically less perfect than he was before the injury; that he complained of and suffered pains in his back and sides; that two of his ribs, healed by then, had been broken; and that there was a depression over the liver, a depression the jury might have concluded was due to the breaking or nature-wrought repair, of the ribs. Under the evidence, and reasonable inference deducible from the evidence, it was for the jury to decide whether, as alleged, the plaintiff was permanently injured, and had suffered an injury that, according to every reasonable probability, would continue throughout the remainder of his life."

In the case before us there was testimony that prior to the

accident the appellee was active physically and mentally, that since his injuries he has stopped working and that he has discontinued almost all physical and mental activities. In Smith's words, he has become a "walking corpse." There was considerable testimony by Dr. Krejci concerning the extent of Smith's injuries. And Smith's condition has gotten worse over the three year period. It also could reasonably be inferred from Dr. Krejci's statement that although Smith's condition would significantly improve with prolonged intensive physical therapy, there would not be complete recovery. From all this evidence, a jury could determine that Smith has sustained permanent injuries.

*Judgment affirmed.*
*Costs to be paid by appellant.*