GEORGE E. LAHOCKI ET AL. *v.* CONTEE SAND & GRAVEL CO., INC. ET AL.

[No. 598, September Term, 1978.]

*Decided March 8, 1979.*

580

The cause was argued before MORTON, MOORE and LOWE, JJ.

*Joseph M. Bryan* and *Ronald S. Schimel,* with whom were *Levan & Schimel* on the brief, for appellants George and Doris Lahocki. *Edward S. Digges, Jr.,* and *Francis B. Burch, Jr.,* with whom were *Joseph G. Finnerty, Jr., Robert Dale Klein, Otis M. Smith, John P. Raleigh, H. Richard Elmquist, James C. Cubbin* and *Piper & Marbury* on the brief, for appellant General Motors Corporation.

*Laidler B. Mackall,* with whom were *Loren Kieve, William N. Zifchak, Steptoe & Johnson* and *Sasscer, Clagett, Channing & Bucher* on the brief, for appellee Contee Sand and Gravel Co., Inc.

Lowe, J., delivered the opinion of the Court.

This appeal is from a judgment grounded upon a jury verdict in the Circuit Court for Prince George's County, wherein George E. Lahocki was awarded one million two hundred thousand dollars from General Motors Corporation, and he and his wife an additional three hundred thousand dollars to compensate them for injuries sustained by Mr. Lahocki when he was thrown from a General Motors Corporation van after its top detached in a one car accident. Because of the complexities of the relatively new theory of "strict liability" to which the parties make reference, it may be misleading to say that the most serious concern of the appellant General Motors Corporation is with the sufficiency of the evidence.

A favorite pastime, if not a predilection endemic to most professions, is an overwhelming preoccupation with professional jargon. New and strange languages create an aura of mystique which protects the professions from a layman's understanding. By perpetuating the myth of an apparent mental omniscience ascribed to a select few who speak the language, the underlying secret, that any of the mystique-shrouded professions are based on common sense and experience, is protected.

In protecting our professional selves from being understood, there exists the danger that we will become confused by our own semantics. To avert that danger we pigeonhole our linguistic discoveries as we define them, but our pigeonholes are becoming so overcrowded that they too have begun to run together and we must again improvise. Where the contractual concept of warranty, for instance, required an oft unprovable element (privity) [1] in order to allocate a more or less inevitable loss upon one of several responsible parties (usually the one with the deeper pocket), we simply removed the divider and categorized the "new" concept as a combined pigeonhole which we call generically "strict liability," presumably to distinguish it from a more

---

1. But see Md. Com. Law Code Ann. § 2-318 (1975) abolishing the need for privity.

lenient counterpart for escaping liability. We will encounter the developing patois of that concept throughout this opinion; but generally speaking, we can begin with a generic rule that has emerged to describe this relatively new offshoot of an old concept.

A seller is now to be held liable for injuries resulting from a defective condition in the manufacture or design of any product which may reasonably be expected to be capable of inflicting substantial harm. *See Phipps v. General Motors Corp.,* 278 Md. 337, 344-345 (1976). There are two particular categories in which the "strict" liability of the manufacturer departs from normal standards of care, although the tort is essentially a matter of traditional negligence. One of these involves the warnings of dangers in the use of a product; the other involves its design.

The case we address borders upon the latter in that design cases usually turn upon whether a product was reasonably safe for some foreseeable use tangential to that for which the product was designed. In the vocabulary of automobile tort law, these cases are clept "second collision" cases; the alleged duty breached by the manufacturer is a failure to make an automobile "crashworthy." The claimant must show that his injury was "enhanced" through the lack of a proper design sufficient to safeguard him from a foreseeable injury resulting from an automobile accident. One of the most significant changes from traditional tort law is that an automobile accident has become a *per se* foreseeable consequence of automobile ownership.

The use of the term "second collision" points up the "enhanced damages" aspect of these cases. It derived from the reasoning that had the manufacturer properly anticipated the danger and provided a reasonable safety design the injury would have been limited to that derived from the original impact. Without the safety device, the victim was involved in a "second collision" following the initial impact, usually within the vehicle itself, from which his injuries were derived or enhanced. It is only for the heightened degree of damage that a defectively designed product's manufacturer may be held liable, *i.e.,* the total injury less that which would have

been sustained even with the absent safety feature. In more familiar terms, enhancement is nothing more than the requisite causation element linking the defect to the injury.

The case before us is not quite in the design defect category but neither does it require a separate pigeonhole, devolving as it does from its more generic progenitor, "strict liability." Appellee does not charge General Motors with a failure to foresee the probability of an accident, nor does he fault the design adopted by it to safeguard against a "second collision" if one occurred. To the contrary, he adopts the standard of design and workmanship which General Motors established to protect against such injury. Appellee charges G.M. with the failure to comply with its own established standards. The defect that caused the injury, says appellee, was not in design, but in manufacture.

Under this offshoot of strict liability, which is itself an offshoot or extension of traditional negligence concepts, an injured party has the advantage of both the old and the new. A plaintiff may, if possible, prove some specific act (or omission) of negligent conduct as required under the traditional concept; however, he need not do so, because the relevant inquiry in strict liability actions focuses upon the product itself rather than the conduct of the manufacturer. In many instances, but not always, there is less difficulty in applying a defectiveness test by examining the product vis-à-vis an established standard than there is in trying to prove that the manufacturer's conduct of workmanship was improper. *See Phipps,* 278 Md. at 344.

The design here which Lahocki readily admits could have averted his injury, if properly executed, was the top of a van in which he was riding. Such vehicular roofs, said the court in *Dyson v. General Motors Corporation,* 298 F. Supp. 1064, 1073 (E.D. Pa. 1969), should provide an occupant with something more than protection against rain. The something more in this case, appellee believes, was the provision of a restraint to keep his body from being thrown arc-like in the air from the vehicle in which he was a passenger. This uninhibited departure allegedly caused him to land on a hard-top road surface and to break his back.

— the facts —

George E. Lahocki was the passenger in a General Motors Corporation (G.M.) van that had been equipped by its owner (Warner) with a make-shift plastic passenger seat affixed to the front floor, and on which Mr. Lahocki was seated. The owner had also equipped the van with pipes racked inside and out, and with interior bins full of plumbing supplies and tools. The van, driven by co-worker George Campbell, was proceeding between 40 and 55 miles per hour on a highway when it struck and "rode" heavy timber barricades placed there by the Contee Sand and Gravel Co., Inc. (Contee),[2] a contractor repaving a portion of the road. The van "went up in the air and flipped," damaging 142 feet of barricade before its forward progress ended. It came to rest upside down separated from its roof panel which lay near by. Although the driver was still inside and relatively uninjured, Mr. Lahocki lay on the road some distance from both van and roof panel.

Based upon expert evidence, Mr. Lahocki contended that the roof panel came off because it was inadequately welded according to G.M.'s own standards, and that his broken back was the direct result of having been thrown out of the vehicle through the open roof. He argues that he would not have been so injured if the roof had remained intact. G.M. contends that the roof attachment defect was irrelevant because: 1) it would have come off anyhow, 2) Lahocki was probably injured inside the vehicle and, 3) he might have been ejected through other openings in a roll over accident even with the roof intact.

— duty —

General Motors Corporation (G.M.), appellant, contends that appellees (Lahockis) failed, as a matter of law, to meet their burden of proving that G.M. breached a duty to them, whether viewed under the traditional category of negligence or the contemporary label of strict liability, both of which are roughly the same, but vary in the manner of proof.

---

2. An original party defendant directed out upon motion, of which more will be said.

*Dreisonstok v. Volkswagenwerk,* A.G., 489 F. 2d 1066 (4th Cir. 1974); *Frericks v. General Motors Corp.,* 274 Md. 288, 301 (1975). Citing a multitude of cases, G.M. relies upon the recognition a principle by the Court of Appeals in *Volkswagen of America v. Young,* 272 Md. 201, 219 (1974), that the duty ascribed to the manufacturer to produce a crashworthy vehicle is one of reasonable care in order to avoid subjecting a user to an unreasonable risk of injury in a foreseeable collision. There are foreseeability limitations upon that duty at both ends of the spectrum. The manufacturer need not anticipate and guard against injuries in "bizarre" accidents, *Dreisonstok,* 489 F. 2d at 1070-1071, nor guard against inherent dangers obvious or patent to the user, *Volkswagen,* 272 Md. at 219, as if assuming a known risk, in more traditional jargon.

It is G.M.'s view that this accident borders on the bizarre and, if reviewed fairly, should be placed in the outer limits beyond that degree of foreseeability against which a manufacturer must provide protections. In short, the circumstances of this accident were such, according to G.M., that it was not reasonable to extend G.M.'s duty to include protection against it.

We agree with appellant — to a degree — that whether a duty (and thus, a breach of that duty) exists is ultimately a question of fairness, *Dreisonstok, supra,* at 1070 n. 9, but G.M. has merely recited the vague concept of fairness, from its point of view, as the standard to be applied — not by a jury, but by a court as a matter of law. The ingredient of fairness that we recognize in the foreseeability test would be better described as reasonableness, and even then we are headed toward a Catch 22 argument.

It is hard to justify *any* accident as either fair or reasonable from a car manufacturer's posture, because collision is not an intended use of the vehicle, but an abnormal one. Maryland rejected that precise reasoning, however, when the Court of Appeals forsook *Evans v. General Motors Corporation,* 359 F. 2d 822 (7th Cir. 1966), for the philosophy of *Larsen v. General Motors Corporation,* 391 F. 2d 495 (8th Cir. 1968); *see Frericks v. General Motors Corp., supra* at 293-294; and

finally adopted the doctrine of strict liability in *Phipps, supra.* We now must adjust our thinking to recognize that accidents *are* a part of driving, *Volkswagen of America,* 272 Md. at 210, 215, 217, and foreseeability is a factual question unless the accident is so unquestionably "bizarre" as to be a matter over which reasonable minds could not differ.

We recognize that there is a limit beyond which foreseeability becomes impossible as a matter of law, and that it may vary jurisdictionally. But in seeking to draw that line we should remember that in Maryland our faith in the jury system causes us, in tort actions, to lean away from depriving the jury of its fact-finding function whether by summary judgment (*Driver v. Potomac Electric,* 247 Md. 75, 79 (1967)) or a directed verdict. *See Mass Transit Adm. v. Miller,* 271 Md. 256, 259 (1974).

In Maryland, as a guide to the outer limit of what is a factually unreasonable foreseeability, the Court of Appeals adopted by dicta in *Volkswagen of America,* 272 Md. at 219, the *Dreisonstok* and *Dyson* example of a high speed head-on collision with a truck. What, if anything, less than that we would hold "bizarre" is an open question, but the facts of this case do not approach that bench mark. The facts here are even less extreme than those in *Frericks, supra,* where the injury was sustained by the collapsing roof of a car which was being operated " ' at an excessive and unlawful rate of speed ... causing said vehicle to run off the road ... and to overturn'." *Frericks v. General Motors Corp.,* 274 Md. at 303. While suggesting that there was created a factual issue of reasonableness of design, the Court held that, from the facts as set forth in the declaration, it could not conclude

> "... that the accident in this case was of such an unusual nature and severity that, as a matter of law, respondents had no duty to design the car to prevent injuries occurring as a result of a 'secondary impact' in the accident." *Id.*

Clearly, if that case does not as a matter of law exceed the outer limits of foreseeability as to G.M.'s design duty, the

case before us provides a jury question of whether G.M. met its design and manufacturing duty.

Appellant showed through expert testimony that according to industry standards, and with reference to G.M.'s own specifications, the van's roof was not affixed by a requisite number of "good" welds. G.M.'s own specifications, as stated by G.M.'s expert Alan Thebert, required 234 welds. The Lahockis' expert based his own calculations on a requirement of only 212 welds. He stated that based on industry standards, and his own expertise, a diameter of at least .187 inches for each weld was necessary for a proper attachment of the roof. He found only 67 of the welds qualitatively met these standards. Because, as we have indicated, the focus in strict liability cases is upon the product, making it substantially easier to prove the breach of duty, *Phipps,* 278 Md. at 344, sufficient evidence was produced to provide a jury question, *i.e.,* whether the product placed upon the market by G.M. was unreasonably dangerous. *Phipps,* 278 Md. at 351.

— relevant defect —

Appellant's next argument is equally unconvincing. It contends that because the likelihood of injury within a contained vehicle is substantial, the defective roof does not unreasonably aggravate the risk of injury inherent in the accident. But this contention is supported, if at all, by the stability of a pronouncement by G.M. that:

> "By far, the most common cause of injury in an accident is what is known as the second impact between an occupant and some surface."

Thus says G.M.:

> "Common sense and experience indicate that a person who sits unrestrained in a van as it is rolled over heavy timber construction barricades at 50 miles per hour and who is thrown around the inside of that van as it tears up 142 feet of those barricades has a very good chance of receiving a serious injury or being killed. If that occupant is to be heard to say

that the manufacturer who had nothing to do with causing the accident, is responsible for his injuries, he should be prepared to prove it beyond speculation."

We cannot judicially proclaim as fact that upon which the argument rests. What G.M. fails to comprehend is that "experience and common sense" are jury arguments, not cognizable as matters of law, short of facts so common place as to require judicial notice. The evidence introduced in this case is that Lahocki's sole injury, a broken back, occurred as a result of his having been thrown from the vehicle. Indeed, it was opined by an expert that generally the risk of *any* injury is greater when one is ejected in an accident rather than contained in the vehicle. There was sufficient evidence that the injury was directly related to the defect for a jury to so find.

— enhancement —

A somewhat related argument by G.M. follows from the rather obvious premise that a defect in an automobile which does not *cause* an accident does not subject the manufacturer to liability for all injuries sustained in the accident, but only that portion caused by the defective condition over and above the damage or injury that would have occurred as a result of the collision, absent the defect, *i.e.,* the "enhanced" injury.[3]

---

3. This facet of the strict liability doctrine in this type of second collision case raises numerous exercises in academic and judicial semantics. In this case, for instance, would appellant have been entitled to the defense of assumption of risk or contributory negligence as a bar to the passenger's claim? Factually it would seem that one who assumes a seat in a plastic makeshift chair tack welded to a truck's floor, without any visible safety restraints or devices, must implicitly know what the new doctrine imputes to manufacturers, *i.e.,* that cars have accidents, and if such occurs while he occupies the makeshift plastic chair situate in the traditional "death seat" location, some injuries would be clearly foreseeable. As to the auto owner, he may have assumed the risk; however, because he had a right to expect the top to stay on, can he be said to have assumed the risk of flying out of the top of the vehicle in the event of a roll over accident? Had the case been tried against the driver Campbell, could Campbell have escaped liability because Lahocki assumed the risk, but G.M. have been held for the "enhanced" portion of the injury which the passenger could not have foreseen to assume?

These issues were not raised on this appeal; nor have our appellate courts been called upon to rule upon the role of these defenses in such strict liability cases.

*See Frericks,* 274 Md. at 304; *Larsen,* 391 F. 2d at 503. That principle, though somewhat obscured by the developing professional patois, is but a part of the necessary proofs of any traditional negligence or strict liability case, *i.e.,* that there be some reasonable connection between the act or omission of the defendant and the damage or injury that the plaintiff has suffered. W. Prosser, *The Law of Torts* 236 (4th ed. 1971). In older judicial jargon that connection is referred to as "proximate cause"[4] and is intended to depict the limitation placed upon the wrongdoer's responsibility for the consequences of his conduct. Because in strict liability "second injury cases" the initial injury is dependent upon some preceding primary negligence, the injury that was proximately caused by the design or construction defect is most often distinguished from that which would have occurred despite the defect, as the "enhanced" injury. We agree with G.M. that there must be evidence of such causal connection. We depart from G.M. on how much is enough.

We begin our departure from G.M.'s reasoning when it points to *Huddell v. Levin,* 537 F. 2d 726 (3rd Cir. 1976), for the premise that the plaintiff not only must prove that his injury was enhanced by the defect attributable to G.M., but also must specifically set forth what precise injuries would have occurred absent the defect.

> "Thus [says G.M.] ... the plaintiffs also were required to prove, beyond speculation, what injuries Mr. Lahocki would have sustained had the alleged construction defect not been present, i.e., what injuries Mr. Lahocki would have received had the roof of the van stayed on during the accident sequence."

To state such a premise in this case points to its absurdity unless a plaintiff's experts could qualify as soothsayers. Mr. Lahocki had a single indivisible injury, a thoracic spine injury,

---

4. The term is not recommended for use in jury instructions because of its potential for misconstruction with its sound alike antonym "approximate". The term "proximate cause" is really the legal cause or causation in fact. It is the limitation which the courts have placed upon the actor's responsibility for the consequences of his act. Prosser, *supra* at 238.

a broken back. No other injury was asserted against G.M. One of Mr. Lahocki's experts in biomechanics was asked on direct examination precisely the question which appellant now contends was the necessary, but absent, proof for the Lahocki claim:

> "Q. Assume that the roof of this van stayed on during the roll sequence, and the driver, Mr. Campbell, was found in the van after it came to rest with little or no serious injuries. Do you have an opinion founded on the basis previously stated, including your inspection of the van and your observations that you made concerning it as to what injuries of a serious nature, if any, Mr. Lahocki would have received?"

The answer, which was based upon the expert's knowledge of biomechanics, experience with anthropomorphic dummies and an inspection of the vehicle, came in over appellant's objections:

> "That he would not have suffered a serious injury, and in particular, he would not have suffered a thoracic spine injury."

The validity of such an opinion, while arguable, was for a jury to decide. It was at least *some* evidence of causal connection between the defect and the injury. "Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury." *Fowler v. Smith,* 240 Md. 240, 246 (1965). That rule requires submission of the case to the jury if there be *any* evidence, "however slight," legally sufficient as tending to prove negligence (*i.e.,* a breach of duty) the weight and value being left to the jury. *Id.; Mass Transit Adm. v. Miller, supra,* 271 Md. at 259; *Curley v. General Valet Service,* 270 Md. 248, 264 (1973). The trial judge here submitted the issue with an appropriate instruction utilizing the distinguishing new language, "enhanced injury," and

perhaps went even farther in G.M.'s favor than was necessary:

> "The plaintiffs are required to prove by the weight of the evidence and not by speculation or conjecture what injuries would have resulted to Mr. Lahocki had the roof not separated, and you must compare those injuries with the injuries actually received by Mr. Lahocki in order to determine to what extent, if any, Mr. Lahocki's injuries were caused by or enhanced by any defect in the van.
>
> If you find that even if the roof had not separated Mr. Lahocki would have sustained the same injuries or a similar injury, or even a different but equally serious injury in the accident, either within the vehicle or due to ejection through another opening such as — another opening other than the roof opening, such as the windshield area or the window area on the right door, or wherever else, then your verdict should be for the defendant General Motors Corporation because obviously the defect in the roof would have nothing to do with the injuries sustained in this case."

Although appellant set up hypothetical possibilities [5] on cross-examination which the witness could not positively exclude, such hypotheses go to the weight of his testimony, they do not remove the opinion expressed from the jury's consideration. *Baltimore Transit Co. v. Smith,* 252 Md. 430, 436 (1969). Thus, even if we agreed with appellant that it is a plaintiff's burden to prove what injuries would have been sustained had the defect not been present, that was done for purposes of this case. The answer was "none." But we do not agree that such specificity as G.M. demands is part of plaintiff's burden of proof.

---

5. The possibilities included: that Lahocki may have struck his head on various objects as the van turned over, or that "part of his upper torso may have gone out the window and been crushed between the van and the street as the van rolled over."

G.M. contends that the plaintiff must not only prove his injuries and connect those attributable to G.M. causally, but also that he must precisely apportion the injuries among the wrongdoers:

"In order to prove that Mr. Lahocki's injuries were enhanced by the alleged defect the plaintiffs were required to show what his injuries would have been had the roof remained attached. This could have been accomplished by reconstructing what his motion would have been and showing what injuries would have resulted. Despite having hired two witnesses professing expertise in these areas (Somerset and McElhaney), plaintiffs offered no such evidence."

As mentioned, G.M. relies primarily upon *Huddell v. Levin,* *supra.* There, the holding was that "design defect" cases asserting damages as the result of a "second collision" "require a highly refined and almost invariably difficult presentation of proof in three aspects." 537 F. 2d at 737. The first deals with the defect, *i.e.,* there must be shown an alternative, safer and practicable design. Second, and this is the source of G.M.'s concern,

"the plaintiff must offer proof of what injuries, if any, would have resulted had the alternative, safer design been used." *Id.*[6]

The third was a corollary to the second, the plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the design defect. *Id.* at 738.

Before addressing the reasoning of *Huddell,* we note that, but for the Supreme Court, we are not bound by federal cases, *Wiggins v. State,* 275 Md. 689, 690-691 (1975); they are

---

6. In explaining the extent of the second requirement, the *Huddell* Court adopted the following language which anticipates the likelihood of the entire injury being attributable to the defect, as was the proof in this case.

" 'it is absolutely necessary that the jury be presented with some evidence as to the extent of injuries, if any, which would have been suffered . . . had the plaintiff's hypothetical design been installed . . . .' " *Id.* at 737-738.

authority only to the extent that they are convincingly reasoned. *Huddell* is not even authority for all other federal courts, since it was predicting, without the guidance of New Jersey precedents, what would be New Jersey law when the issue reached its state courts. *Huddell,* 537 F. 2d at 733. Although its reasoning has appealed to some federal courts trying to predict what other states might do, *e.g., Jeng v. Witters and General Motors Corp.,* Prod. Liab. Rep. (CCH) ¶ 8322 (M.D. Pa. June 26, 1978), it has not persuaded its appellate peers. *See Fox v. Ford Motor Co.,* 575 F. 2d 774, 787 (10th Cir. 1978).

In a State that frowns upon speculations by experts, *Kujawa v. Baltimore Transit Co.,* 224 Md. 195, 203-204 (1961), the appeal of the *Huddell* dissent, pointing out the practical impossibility of proving with specificity that which *might* have happened absent a defect, is most beguiling. The *Huddell* dissent's alternative has more practical appeal to this Court, based as it is on common sense reasoning which comports with recognized burdens of proof.

> "I cannot join with the majority in denying recovery to Huddell if, on retrial, she fails to meet the virtually insurmountable burden of apportioning her decedent's death between Levin's negligence and General Motors' defective design. Instead, once she has shown a modicum of enhanced injuries by testimony that the defect caused an otherwise survivable accident to be fatal, the burden should shift to the defendants to apportion damages *inter se* and limit their liability if they can." 537 F. 2d at 747 (footnote omitted).

To require the plaintiff, in this manufacturing defect case, to prove how, and how much, he would have been injured "but for" the defect in the manufacturer's product, simply denies the application of strict liability to such cases.

The very purpose of strict liability is to ease an injured party's burden of proof where it was heretofore foreclosingly difficult. By focusing on the product rather than the conduct of the manufacturer, the "new law" is practically another

form of negligence per se. *Phipps,* 278 Md. at 351. The "newness" of the concept obscures the fact that "strict liability" is not a radical departure from traditional tort concepts, and compares favorably to the doctrine of res ipsa loquitur. Res ipsa, of course, is the rebuttable presumption that a defendant is negligent, and arises from proof that the instrumentality causing the injury was in defendant's exclusive control. *Potts v. Armour & Co.,* 183 Md. 483, 486 (1944). In *Phipps,* strict liability is described as:

> "Proof of a defect in the product at the time it leaves the control of the seller implies fault on the part of the seller sufficient to justify imposing liability for injuries caused by the product. Where the seller supplies a defective and unreasonably dangerous product, the seller or someone employed by him has been at fault in designing or constructing the product." *Id.* at 352.

The adoption of the concept of strict liability was intended to make it easier for injured parties "to comply with the proof requirements of negligence actions." *Id.* at 352-353. Since damages are a requisite element of proof in negligence actions, it would be contradictory to adopt, for public policy reasons, a concept to ease proof requirements of one aspect of negligence actions (liability), and then to erect an unreasonable and all but impossible barrier to recovery upon another aspect of proof (damages). To do so in this manner would be contrary even to our older traditional concepts of assigning burdens of proof of damages. *See Mullan v. Hacker,* 187 Md. 261, 269-270 (1946).

We find no fault with the underlying premise that a plaintiff must prove that his injuries were "enhanced" (*i.e.,* caused) by the defect. *Some* evidence of enhancement (causation) is prerequisite to engendering a jury issue of assignable damages, just as *some* evidence of liability is a prerequisite to overcoming a motion for directed verdict. But the court below found, and we agree, that there was sufficient evidence to serve that purpose. The evidence ascribed the entire injury to the defect. The burden of persuading the jury

by minimizing the degree of enhancement or causation is the defendant's responsibility. The more persuasive procedure is that set forth in Restatement (Second) of Torts § 433B (1965):

"(1) Except as stated in Subsections (2) and (3), the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff.

(2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

(3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm."

In this case, because Lahocki's evidence rested upon the evidence of Dr. McElhaney, it was an all or nothing effort by Lahocki. When, as here, the evidence presented by the injured party is that "but for" the defect, no perceptible injury would have occurred, what more can a plaintiff offer?

If we hold that he *must* have suffered some harm, how then do we apportion it even if posited by an expert? Dr. McElhaney said expressly there would have been no thoracic spine injury. Were we to accept any of the possibilities (which, upon cross-examination he could not absolutely preclude, *e.g.,* that had the top stayed on the van Lahocki's head might have been injured) how does one subtract a broken head from a broken back? The fact is that the head was not injured, but his back most assuredly was, and there was evidence that it would not have been had the top stayed on. The burden of proof as to the apportionment of damages should rest on defendants. Here, the jury had sufficient evidence before it to decide that ejectment through the top of the van solely caused plaintiff's injury.

— proof positive —

G.M.'s enhancement concern ends with a Parthian dart; it contends that because it showed the possibility that Lahocki might have been ejected from "no less than four open portals," he did not satisfactorily establish that the alleged defect was the cause of his injury. The three additional possibilities for his departure were brought out in the defense case by G.M. and were adequate jury questions. However, in addition to the expert testimony indicating the likelihood of ejection through the absent roof area, mere common sense could have inferentially indicated that the enlarged aperture was a more likely possibility than the other three suggested by appellant, *i.e.*, the open window next to the driver (who was not thrown out), the open window next to Lahocki or the windshield.

## Disputed Admissibility

— the expert opinion —

Included in the testimony of Mr. Lahocki's treating physician (Dr. Arthur Litofsky) was his response to a hypothetical setting forth the facts of the accident and the injury in the case. It asked for an opinion of the cause of injury.[7] The doctor's response that "[t]he impact with the ground would have caused that injury," is an object of appellant's immediate concern.

---

7. "Doctor, assume a patient, George Lahocki, in normal health is riding as a passenger in a van which was going approximately 50 miles an hour on University Boulevard, that that van was involved in a rollover collision after it struck some barricades, and the van went 142 feet causing Mr. Lahocki to be thrown about inside that van and that he was ejected through the roof assembly which had separated from the van body, and when he was ejected he was found approximately 15 to 20 feet from where the van came to rest and he hit the ground at an impact speed of 23 to 31 miles per hour, and that thereafter in your physical examination of him he was found to have a dislocation fracture at T-7 and T-8. Can you express an opinion within the realm of reasonable medical probability as to what would be the mechanism of injury under that set of circumstances?

A The impact with the ground would have caused that injury."

G.M. contends that despite the doctor's medical qualification as a neurosurgeon and his personal knowledge as attending physician from the time of the accident, he was not qualified to express an opinion on the cause of injury because, G.M. contends, he was unqualified to reconstruct the motions and forces during the accident. G.M. emphasizes the doctor's limitations by pointing out his acknowledgment on cross-examination that he had no formal training in the new sciences (already with their own vocabulary), such as biomechanics, occupant kinematics, or trauma mechanism analysis.

G.M. relies upon several cases in which the opinions of experts expressed in the context of those cases were held to be improper either because their special educational qualifications were not apposite to the opinion sought or they lacked the personal knowledge prerequisite to the foundation for the opinion. We need not go beyond the language of those cases cited by G.M. to hold that the trial judge here did not abuse his discretion in permitting the doctor to express his opinion as to the cause of the injury. The cases cited simply point out that whether the discretion is properly exercised is an individual question of fact in each case, and that opinions should not be allowed beyond the area of expertise of the witness.

The question here then is whether establishing which circumstance was the most likely cause of a thoracic spine injury from a confined description of accident sequentia, was a proper area of testimony for an attending neurosurgeon. A review of Dr. Litofsky's testimony clearly indicates both factual and educational predicates sufficiently related to justify an opinion. See *State Health Dep't v. Walker,* 238 Md. 512, 520 (1965); *Uhlik v. Kopec,* 20 Md. App. 216, 223-225 (1974), *cert. denied,* 271 Md. 739 (1974). As pointed out in *Beth. Shipyard v. Scherpenisse,* 187 Md. 375, 379-380 (1946):

> " . . . where an injury or disease is such as to require a person skilled in medicine to determine its cause, a medical expert may testify to his opinion thereof based upon his scientific deductions from given facts. . . . His opinion is admissible in evidence as to

> the cause which produced, or probably produced, or might have produced, a certain physical condition. As we said in *Langenfelder v. Thompson,* 179 Md. 502, 507, 20 A. 2d 491, 136 A. L. R. 960, the opinion of an expert as to the probability, or even the possibility, of the cause of a certain condition may frequently be of aid to the jury . . . ."

Furthermore, that Dr. Litofsky was not formally educated in the biomechanics-related fields does not foreclose him, as a neurosurgeon, from rendering his opinion in traumatic injury causation. It may affect the weight of his testimony before the jury, but the law of the State does not require such refined degrees of specialization. *Radman v. Harold,* 279 Md. 167, 170-173 (1977). If no one but such limited specialists should be permitted to testify, it would greatly add to the expense of trials and would often deprive those of limited means of any medical testimony sufficient to prove causal connection. *United Rys. Co. v. Corbin,* 109 Md. 442, 454 (1909). While medical experts should not be permitted to express their opinions merely because they are physicians, *id.* at 450, the discretion of the trial court in admitting Dr. Litofsky's testimony as proper, will not be overturned absent a clear abuse. *Radman v. Harold,* 279 Md. at 173; *Beahm v. Shortall,* 279 Md. 321, 338-339 (1977). We do not find such a manifest abuse here.

Appellant also complains about the concurring opinion of Dr. McElhaney, who *was* an expert in biomechanics. Dr. McElhaney was of the opinion that Mr. Lahocki received his thoracic spine injury when he struck the pavement after being ejected from the van and that he would not have sustained that injury had the top stayed on. G.M.'s attack does not question Dr. McElhaney's credentials, but rather questions the adequacy of the foundation:

> "General Motors submits that there was no adequate foundation in the record for either opinion and that, therefore, the receipt of these opinions was clearly erroneous."

Apparently, once again appellant confuses admissibility

with persuasiveness. As pointed out in *Baltimore Transit Co. v. Smith,* 252 Md. at 436:

> "Had he [the doctor] failed to consider any essential facts in forming his opinion as to the cause of the injuries, then the weight of his testimony might be weakened, but its admissibility would not have been destroyed."

Whether the expert performed a satisfactory accident reconstruction, the effect of his having found no "significant interior impact," or that he discounted possibilities that appellant feels were probabilities, all goes to the weight of his opinion. It does not preclude his offering one. *Uhlik v. Kopec,* 20 Md. App. at 223-225. Our review of the record reveals ample, even substantial, evidence to provide a foundation for his opinions, but it would serve no purpose to itemize, page upon page, that upon which we rest our conclusion. It must suffice that in our review of the transcript of nearly 5000 pages extracted to 1600 (and briefed in but 216), there was foundation evidence in sufficient quantity for submission of the opinion to a jury. *See Beahm v. Shortall,* 279 Md. at 339-340.

— the movies —

The discretion exercised by a trial court in admitting or rejecting motion pictures is considered one best left to the judgment of the presiding judge. No precise limitations beyond his own good judgment have been laid down. *State v. United Rwys. Co.,* 162 Md. 404, 418 (1932). The usual concern of reliability and accuracy is not relied upon by G.M. who instead questions the propriety of permitting Lahocki to exhibit certain slides and short film episodes.

The first film material, of which objection is raised, concerned certain impact test slides and movies that Dr. McElhaney, who was being offered as an expert in biomechanics, had prepared for a government project. Lahocki, through counsel and the witness, repeatedly affirmed that these films were being offered to explain to the

jury the nature of the doctor's specialty during the voir dire on his qualifications as an expert, and not as evidence in connection with his testimony, or as factual support for any opinion expressed in relation to the testimony in the case. The preliminary objection taken acknowledged the purpose, and was not directed to that purpose, but was limited to the films' potential for misleading jurors in that they might improperly apply the films to the facts of the Lahocki case.[8] The court permitted the showing and narrative explanation, during which G.M. again sought to preserve its objection out of the hearing of the jury:

"MR. DIGGES: I want to be sure the record is clear and would at this time in open court as opposed to in camera move to strike the films and slides that have been shown for the reasons that I stated in camera in support of my objection, and would further comment that I think the narration that went with the films highlights the point that I was making that they could be misleading relative to the substantive issues in this case by virtue of allowing this witness to talk about things and show things that he otherwise would not be able to show in connection with the substantive issues because he would not be able to satisfy the requirement of similarity that he would need to show to enter such evidence in terms of what happened to this van in this accident."

The judge asked:

"Well, do you want me to indicate this at this time to the jury?"

---

8. "MR. DIGGES [Attorney for G.M.]: Your Honor, even with the understanding that these slides and films are to be used in connection with establishing this man's qualifications, General Motors Corporation would respectfully object on the basis that they are unnecessary for the purpose of establishing this man's qualifications in the area of biomechanics, and more importantly, are potentially misleading in terms of what they represent as it relates to this case."

Counsel for G.M. responded:

"I think at the very least."

The judge then addressed the jury with the following limiting instruction:

"Ladies and gentlemen of the jury, the prior color slides and film that was offered for your inspection or viewing was offered in the realm of qualification of Dr. McElhaney, or at least to indicate what experience he has had in related fields of biomechanics, or the testing of the bodies of persons, or the effects of forces or trauma on bodies.

The slides and the film were not offered to you as evidence in this case, nor should you view it as evidence of anything connected with the case. It is only offered for the purpose of showing what background exposure Dr. McElhaney has had and to assist you in understanding his qualifications and also assisting the Court in making some decisions with regard to his qualifications."

While it is not incumbent upon us to address the propriety of the admissibility, only whether its admission abused the court's discretion, we must note the unique field of expertise about to be presented to a lay jury. How many average persons are even aware of what biomechanics, occupant kinetics or trauma mechanism analysis comprehend? To examine the qualifications of a proposed expert in these fields before a jury, without some explanation of what the field comprehends, would be meaningless gibberish.

The demonstrative explanation of the expert's raison d'être prefatory to examining his qualifications gave purpose to what was to follow before the jury. In balancing the potential for prejudice — that is, the misleading possibilities feared by G.M. — against the purpose and need to be reviewed, the court obviously felt that any danger of misuse of the photographic demonstrations could be overcome by the limiting instruction. We agree. We find that the court did not abuse its discretion and, indeed, the limiting instruction was

timely given for its greatest effect, at the urging of G.M., precluding the prejudice potential before it was "abornin."

— experiment movies in rebuttal —

One of G.M.'s theories of defense was that Lahocki was injured within the confines of the vehicle and, consequently, the roof defect was not relevant to the injury. G.M. produced an expert, Dr. Moffatt, to express his theory of why this was so. Contrary to Lahocki's expert, Dr. McElhaney, who had theorized that Lahocki was thrown out of the top and travelled arc-like to the roadbed breaking his back, Dr. Moffatt thought the injury was sustained when Lahocki was thrown shoulders first onto the right doorsill in the course of the van's rollover.

To counteract this possibility, McElhaney rebutted by indicating that the door was not dented substantially enough to support Moffatt's theory. Having testified that it took over 2000 pounds of force to cause Mr. Lahocki's injury, McElhaney prepared a series of filmed tests (during the prolonged trial) to discount the likelihood of Dr. Moffatt's theory. The upper torso of an anthropomorphic dummy was attached to a hydraulic arm and placed against the interior of a van door similar to that of the van in question. Four stages of increased pressure were placed upon the door through the anthropomorphic-hydraulic device ultimately shattering the window glass at 840 pounds pressure, and deforming the door much more substantially than the indentations in the door of the Lahocki vehicle.

G.M. points primarily to three differences to support its assertion that the test varied so dramatically from the original incident as to be of no probative value, and should not have been admitted. However, the tests were not offered nor admitted to indicate a reconstruction of the accident. To the contrary, they were offered and admitted for the limited purpose expressed by the court in an instruction to the jury prior to the film:

"Ladies and gentlemen, the film sequences that you are about to see don't represent evidence of

what occurred in this accident. They are only used to demonstrate to you what a force of 200, 400 and 600 and 840 pounds applied in a dynamic — or a static situation, strike that, as opposed to a dynamic situation. That means in a still situation the pressure is applied slowly as opposed to one where it might be fast as in an accident sequence.

So just to demonstrate to you a similar type door with certain loadings applied, what happens to the door. Very well."

As we pointed out in *Great Coastal Express v. Schruefer,* 34 Md. App. 706, 724 (1977), *cert. denied,* 280 Md. 730 (1977), the Court of Appeals made it clear in *Smith v. State Roads Comm.,* 240 Md. 525, 538 (1965), that:

"Trial judges are vested with a generous amount of discretion in this area and this discretion will not be disturbed on appeal unless abuse is apparent."

Demonstrative evidence and tests of this nature are admissible for purposes other than reenactment of an accident. It was certainly helpful to a jury to receive visual support for why Dr. McElhaney believed that the injury could not have occurred as Dr. Moffatt had prognosticated. An expert's opinion is only as good as its foundation, *State Health Dep't v. Walker,* 238 Md. at 520, and it makes sense to provide as convincing a foundation as possible. The rebuttal or negative opinion of Dr. McElhaney, that the injury did not occur as G.M.'s experts had testified, is nonetheless an expert opinion. If asked verbally upon what had he based his opinion, it seems beyond question that he could have replied that, based upon tests he had performed, the amount of pressure necessary to cause the injury would have damaged the door far more than the door in question was damaged. The test films, together with the very limiting instructions, did nothing more than demonstratively punctuate his foundation for that opinion. That foundation was subject to attack on surrebuttal by G.M. for whatever reason it could advance, *e.g.,* as argued here, dissimilarity of material, type of force or whatever. It was, however,

admissible for the limited purpose permitted by the judge and was as limited, a proper jury consideration.

## The Releases

Two rejections of evidence concern G.M. Both items were in the nature of releases executed by the Lahockis, but each varied considerably in content and in purpose.

### — the Campbell release —

The first that we will address purports to be a release by the Lahockis of the defendant driver George H. Campbell, Jr., under the Uniform Contribution Among Tort-feasors Act, Md. Ann. Code art. 50, §§ 16-24, for a consideration of $300,000. Appellant was denied the right to introduce the release or even refer to it in its opening statement.

Appellant acknowledges the affirmance in *Brooks v. Daley,* 242 Md. 185 (1966), of a lower court rejection of a similar release on the ground that knowledge of a settlement would tend to mislead a jury not only as to damages, but also as an admission of liability. G.M. avers that *Brooks* does not hold that such agreements are never admissible. It contends that because *Brooks* recognized the potential value of a settlement as an impeachment tool, the case implies that such value should be balanced against the danger of misleading a jury, on a case by case basis.

Assuming appellant is correct, the issue on appeal then becomes one of reviewing the trial judge's exercise of discretion, and in this case we find no abuse. The holding of *Brooks,* at the very least, establishes a presumption to guide a trial judge that joint tort-feasor releases will confuse juries. *I. W. Berman Prop. v. Porter Bros.,* 276 Md. 1 (1975), establishes a separate presumption for appellate judges that trial judges have exercised their discretion with just regard to the rights and interests of all parties. *See also Langrall, Muir & Nopp'r v. Gladding,* 282 Md. 397 (1978). Appellant obviously did not provide persuasive evidence to overcome the jury confusion presumption to the trial judge, nor has it met

the added burden of persuading us that the judge's presumably proper discretionary exercise was abusive.

— secrecy is suspect —

It is hardly conceivable that limitations of liability agreements between a plaintiff and less than all of the multiparty defendants in a case first came into use in 1967. It was in that year, however, that their use was first exposed with notoriety in the case of *Booth v. Mary Carter Paint Company,* 202 So. 2d 8 (Fla. App. 1967), and such agreements were thereafter identified as "Mary Carter" agreements. The Florida Court of Appeals found no fault with the agreement questioned in that case. Six years later, the Florida Supreme Court defined such "Mary Carter" agreements as being

> " ... basically a contract by which one co-defendant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants." *Ward v. Ochoa,* 284 So. 2d 385, 387 (Fla. 1973).

Secrecy is invariably suspect, especially when it entails an appearance of collusion; and, a defendant in a clandestine Mary Carter affair holds himself out to be something he is not and exchanges a minimum guarantee to a plaintiff for a determined maximum expense to himself.

In the case at bar, Lahocki first sued the driver, George H. Campbell, Jr., Warner, Inc., the van owner and Campbell's employer, and the Contee Sand and Gravel Co., Inc. (Contee), which had placed the heavy timber barricades in the road for protection during road construction. Contee filed a third party claim against G.M., seeking contribution or indemnity, alleging an untrustworthy van. Lahocki did not amend his declaration to implead G.M. as a defendant for nearly ten months. Three months later Campbell settled and was released, and both Warner and Campbell were dismissed.

The trial against the primary defendants, Contee and G.M.

was first begun in September of 1977. On the second day of trial Contee and Lahocki entered what G.M. depicts as a Mary Carter agreement. It provided that regardless of the outcome of the trial, Contee's maximum expense was to be $250,000; but in the event of a verdict against it for less than $150,000 it would pay $150,000, nonetheless. If Contee was directed out prior to submission to the jury, it was still to pay $150,000 — *unless* the jury returned a verdict against G.M. alone, whereupon its own liability would terminate; but if Lahocki and G.M. settled, Contee would pay Lahocki $100,000. The agreement was not disclosed despite the court's direction that any "settlement" agreements were to be promptly disclosed to all counsel.[9]

The first trial was mistried. The retrial began on March 20, 1978, and, for the first time, the fact of an agreement between Lahocki and Contee was disclosed when discovered by G.M. upon its renewed motion for production of all settlement agreements. There is nothing that breeds suspicion faster than secrecy to those excluded, nor that pricks the conscience of the privies more smartingly than fear of discovery — even

---

9. The record is not clear as to whether some disclosure was made to the court, however, it is clear that G.M. was never notified. While recollections differed about disclosure to the court, we accept the court's version for the purposes of this case.

"THE COURT:

. . .

So that it doesn't go unchallenged, Mr. Schimel's recollection is somewhat different from mine, and I think maybe I am duty-bound to state on the record what my recollection of it was.

First of all, my recollection was it occurred well after the time of the first trial. When I say that, I mean at least several days after the time of the mistrial. My recollection was you may have considered a settlement with Contee at that time, but you hadn't certainly firmed up any details.

And the second recollection that I had — and I could be wrong about that; that is just my recollection. The second recollection that I had was an inquiry as to whether or not the Court would respect an agreement in the nature of the high-low settlement and I thought my response was I would respect any valid contract between the parties.

As far as saying anything about whether or not they were admissible or whether they should be disclosed or not, I don't recall any discussion as to that and I would not necessarily have made any indications as to that because I don't think the area was inquired into."

if the secret is an innocent one. Because Lahocki and Contee contended that the agreement was not a settlement agreement and that G.M. was not privy thereto, G.M. agreed to withdraw and permit the court to hear the terms of the agreement — on the record. It was decided that disclosure was the proper course; however, the court denied G.M. the right to introduce or to refer to the agreement between Lahocki and Contee or the settlement agreement between Campbell and Lahocki. G.M. then moved that the Contee agreement be declared void as against public policy and was denied that relief as well.

— Mary Carter —

Appellant contends that the agreement smacked of champerty and maintenance, pointing out that in Nevada and Wisconsin "Mary Carter" agreements have been declared void and against public policy. *Lum v. Stinnett,* 488 P. 2d 347 (Nev. 1971); *Trampe v. Wisconsin Telephone Co.,* 252 N. W. 675 (Wisc. 1934). But we have neither the authority nor the inclination to write with so broad a brush. One of the difficulties with such definitive proclamations is the condemnation by identification or by definition without regard to individual circumstance. Appellant would have us brand Mary Carter, like Hester Prynn, without regard to the hows or whys of her conduct or what good or harm resulted by what was done.

Maintenance exists when a person "without interest" in a suit officiously intermeddles by assisting either party, *Wheeler v. Harrison,* 94 Md. 147, 158 (1901); champerty adds the element of an agreement for payment from the subject matter of the suit. Neither Contee nor Lahocki were "without interest" in this case, indeed, it was Contee which first asserted its interest against G.M. by third party action.

Because it is conceivable that agreements, such as the one at bar, could be made that would violate public policy, we limit our holding to this case. At most, our holding might be extended to mean that to destroy the integrity of a right to contract, especially in light of Maryland's encouragement of

settling litigation, *Chertkof v. Harry C. Weiskittel Co.*, 251 Md. 544, 550 (1968); *Dorsey v. Wroten,* 35 Md. App. 359, 361 (1977), the party asking invalidation should show prejudice to itself of some magnitude. Here none has been shown to us.

Appellant contends that there is prejudice *inherent* in any deception of the jury as to the true interests and alignment of the parties. This presupposes, however, that appellant is entitled as a right to a desirable alignment, despite the *natural* antagonisms between an original defendant and a third party defendant brought into the case by the original one. A jury, entitled to all pleadings and obviously aware of the direction of the evidence can hardly be misled as to the underlying alignment. To hold that a party defendant may not protect itself by agreement because of some inherent right to a natural alignment, certainly does not comport even with the right to implead by third party action without regard to whether a plaintiff amends as against the third party or not. In such a case, the original defendant may be willing to admit his own liability but attempt to put his losses off on the third party he impleaded. That too would be "unnatural" from G.M.'s point of view.

Because of the suspect nature of secrets, we are inclined to agree with appellant that such an agreement should have been disclosed promptly, especially when the agreement is such as to be subjected to question as possibly collusive. The difficulty in *this* case is, again, that no prejudice is indicated by the delayed disclosure. Upon discovery of the agreement appellant did not move for a continuance, nor does it now indicate that earlier disclosure would have benefited it. It moved then, and argues now, only for invalidation as against public policy or disclosure to the jury.

The issue of whether such an agreement should go to a jury is a considerably closer question. If it is not comparable, it is not unlike a codefendant in a criminal case who has exchanged by plea bargain an advantage to himself in return for his testimony. We have held constitutionally that the government must disclose the bargain to the jury to be weighed against his credibility.

Appellant claims a similar right, *i.e.,* that as Contee's witnesses were being heard, the jury should have known of the agreement so as to weigh their testimony in the crucible of suspicion. But that was being done anyway. The testimony in substantial measure was expert testimony, and the same expert was retained by both Lahocki and Contee. Experts who testify are suspect merely by virtue of who pays their consideration. *Wimpling v. State,* 171 Md. 362, 376 (1937). That Contee's expert was obviously Lahocki's as well certainly did not diminish that sense of suspicion. Furthermore, there is not the possibility of personal benefit to an expert witness in this type of case that there is to a codefendant in a criminal case.

Concluding for this argument that *Brooks v. Daley, supra,* precludes the introduction of settlement agreements, appellant distinguishes this "Mary Carter" agreement from the settlement agreement in *Brooks.* In *Brooks,* the settling defendant was dismissed; here the settling party participated, with an interest in seeing that the plaintiff did recover.

As we have indicated, *Brooks* appears to us to be a guide rather than a rule. It presumes that settlement agreements create false issues distracting juries from their true deliberative purpose. While we do not find appellant's distinguishing of *Brooks* so compelling as to require reversal, it is a factor that a trial judge should consider in exercising his discretion. Obviously, without more than an ordinary settlement, the *Brooks* presumption should be followed; however, the distinguishing factor pointed out here may well be sufficient to "burst the bubble," *see Rose and Crown, Ltd. v. Shaw Ent.,* 28 Md. App. 548, 555 (1975), and justify an exercise of discretion contrary to the *Brooks'* presumption. It does not follow, however, that it compels admissibility. At best, it may have justified it.

In weighing the purpose to be served by admitting the agreement against the danger of creating misleading diversions or confusion, we cannot say the trial judge abused his discretion, especially when he has a presumption of correctness on his side. *I. W. Berman Prop. v. Porter Bros., supra; Langrall, Muir & Nopp'r v. Gladding, supra.*

— the cross appeal —

Both Lahocki and Contee have contended that they were antagonistic adversaries; that just isn't so. They shared the expense of their most convincing expert and, as observed by the trial judge, Contee spent substantial portions of its time and effort filling in the gaps left by Lahocki.

Perhaps in part to support its denial of a collusive attack on G.M., when Lahocki filed a cross-appeal against G.M. attacking the reduction of its verdict by the trial judge, Lahocki also appealed the verdict in favor of Contee directed by the judge. The crassness of Contee's contention, that it was not aligned with Lahocki to double-team G.M., is belied by its own brief, more than half of which is devoted to defending Lahocki from G.M.'s original appeal, despite the fact that G.M. did not question the Contee directed verdict at all. A smaller portion of Contee's brief disputes Lahocki's cross-appeal against it.

— Lahocki "versus" Contee —

When asked at argument what effect a holding that Contee should not have been directed out would have on G.M., it is of passing significance that Lahocki had not sufficiently addressed himself to that possibility to provide us an answer, nor, in fact, had the other parties. Considering the possibility of that result costing Lahocki a verdict of a million five hundred thousand dollars, one would think that if the cross-appeal were in earnest, its probable ramifications if successful would have been anticipated, if not adequately researched. But neither foreseeable success nor consequential research seems to have crossed cross-appellant's mind.

Ironically, the cross-appeal *has* given us substantial concern as it related to Contee and G.M. The trial judge also expressed an obvious sense of trepidation in his oral opinion (covering nearly 10 pages of the transcript) granting the Contee motion for a directed verdict. But we see no purpose in deciding whether that opinion was correct because we find that his result was proper without regard to his reasons.

As we have noted in our opinion in the direct appeal, Lahocki in his response to the G.M. appeal has convincingly contended on the "enhancement" issue that

" . . . because *Lahocki never sought damages for any other injury save the broken back,* a single, indivisible injury directly attributable to the negligence of General Motors, the foregoing exception to the apportionment requirement is applicable." (emphasis added).

We have previously set forth the *only* testimony in the case by Lahocki of what injury would have occurred to him but for the top defect. The answer was none. Even assuming there was evidence of negligent *conduct* by Contee, nowhere in the record is there evidence by Lahocki that he suffered any *injury attributable* to Contee. If Lahocki himself attributes his entire injury to G.M. for which he was compensated by the jury, certainly he is not entitled to recover anything more against Contee for an injury he does not attribute to that company.

Although there was evidence from G.M.'s expert that the injury might have occurred entirely within the vehicle (which would have attributed it in its entirety to whomever was primarily negligent for the immediate cause of the accident), G.M. did not direct its appeal toward, nor discuss at all, the Contee directed verdict. If an appeal by G.M. of the Contee verdict was interpretatively taken, it has been waived by failure to address any issues thereon.

Lahocki, on the other hand, could hardly be allowed to rely on testimony which its entire case was designed to reject. In the absence of any evidence in the record that Contee was responsible for any portion of the injury not solely chargeable to G.M., there was naught in the way of damages chargeable to Contee for the jury to have considered. In light of the verdict implicitly accepting Lahocki's contention that his entire injury was attributable to G.M., the issue is moot. *See Fox v. Ford Motor Co., supra,* 575 F. 2d at 788. The trial judge was correct in directing a verdict for Contee, if not for the

reasons he assigned, then for lack of evidence of damages attributable to Contee.

## — reduction of the verdict —

The Lahockis contend that "The Court was Incorrect when it granted General Motors Corporation's Motion to Reduce the Verdict by Fifty Per Centum." They then contend that "the trial court had misconstrued 'pro rata share' as such phrase is contained in the Act,[10] and therefore improperly reduced the verdict." The emphasis of their argument is that the pro rata distribution should be to the proportion of the wrong each of the tortfeasors has contributed to the injury. To support their contention, they quote from the Commissioner's Preparatory Note to the Act arguing therefrom that the Act contemplates equal contributions only among those tortfeasors that contribute to an indivisible harm for which each tortfeasor is held to the full extent of all injuries. From that they argue that:

> "The rationale for dividing the total harm into separate parts is that second collision cases are unique: the manufacturer is never responsible for the entire injury since the manufacturer neither caused nor contributed to cause the collision and should, therefore, be liable only for the enhanced injury. The recognition of the feasibility of apportioning the damages specifically attributable to the successor tortfeasor for the enhanced or separate injury evidences the fact that the harm suffered by the injured party is divisible, distinct and apportionable among the tortfeasors. *Higginbotham v. Ford Motor Co.,* 540 F. 2d 762 (5th Cir. 1976).
>
> In the present case, with regard to the second collision, no one could reasonably argue that Campbell was responsible for the defective roof. That defect, according to the jury's findings, was

10. Uniform Contribution Among Tort-Feasors Act, Md. Ann. Code art. 50, §§ 16-24.

caused by General Motors Corporation at the time the van was constructed or otherwise there would have been no basis to find General Motors Corporation liable at all. Further, according to the Judge's instructions (*supra*), if Mr. Lahocki would have suffered the same injuries irrespective of any negligence on the part of General Motors Corporation, then General Motors Corporation would not have been liable for any of the damages. Therefore, the verdict against General Motors Corporation evidences the jury's conclusion as to the extent of the liability that Mr. and Mrs. Lahocki sustained as a result of General Motors Corporation's defective product, namely $1,500,000. If, however, Campbell is deemed to be a joint tortfeasor with respect to the second collision on the basis that he is responsible for all the foreseeable consequences which his negligence was a proximate cause, the issue becomes how should the ultimate responsibility for injuries resulting from second collisions be distributed among these two tortfeasors?"

Pointing once more to the Commissioner's note that the definition of "pro rata share" was intentionally left out of the Act, the Lahockis argue in the alternative that because the jury under the court's instructions necessarily attributed the entire injury to G.M., the award should not be reduced at all because the statutory use of "pro rata share" encompasses a division according to degree of liability. Presumably, and without saying why, Lahocki's alternative suggestion is that if reduced at all the term "pro rata" does not mean proportionate to the number of tortfeasors, but rather proportionate to the settlement dollars of the settling tortfeasor and the dollar amount of the verdict against the adjudicated tortfeasor.

G.M. responds [11] that the original Uniform Act contained

---

11. G.M. asks that we not decide the point under Md. Rule 1085. We elect to do so. See generally Williams v. State, 34 Md. App. 206, 207 (1976) (concurring opinion, Moylan, J.).

an optional provision permitting contributions among joint tortfeasors based upon relative degrees of fault. Because the Maryland General Assembly declined to include that provision, G.M. argues persuasively that, under Maryland's version of the Act, apportionment as to fault is not permissible. It would appear that the legislative alternative provided by the Commissioner was intended for those states having adopted comparative negligence doctrines. This view is clearly supported by the Commissioner's explanatory note relating to the optional subsection of the Uniform Act, which was rejected by the Legislature. It was carefully explained in a paper read before the Barristers Club of Baltimore, on Tuesday, March 30, 1948 by Wendell D. Allen of the Baltimore Bar entitled "Joint Tortfeasors; Contribution, Indemnity and Procedure."

"6. *Pro-rata Share in Contribution.* Pro-rata share is not defined in the 1941 Act. Honorable William Curran, former Attorney General of Maryland and in 1941 a member of Maryland's Commissioners for Uniform State Laws, recently called my attention to the fact that his Commission in cooperation with the National Commissioners on Uniform State Laws presented to the Maryland Legislature in 1941 an original Bill, Senate Bill 254, which would have adopted the doctrine of comparative negligence, as the then proposed Sec. 22, sub-paragraph (d) read as follows:

'When there is such a disproportion of fault among joint tortfeasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tortfeasors shall be considered in determining their pro rata shares.'

The Bill also contained sub-section (e) of Sec. 27 as follows:

'As among joint tortfeasors against whom a judgment has been entered in a single action, the provisions of Section 22, sub-section (d) of this sub-title apply only if the issue of proportionate fault

is litigated between them by cross-complaint in that action.'

However, both of the above sub-sections were deleted from the 1941 Bill as actually passed by the Maryland Legislature, for the reason that the doctrine of comparative or relative negligence had never been adopted in Maryland, as in some other states, either as to the contributory negligence of a plaintiff as compared with the primary negligence of a defendant, or as to the degree of negligence among two or. more defendants charged with primary negligence." *Id.* at 9.

That paper may also bear the responsibility for the accepted interpretive use of the term set forth in § 20 of the Uniform Contribution Among Tort-Feasors Act, which relates to the effect of a joint tortfeasor's release upon a subsequent judgment against remaining tortfeasors. Section 20 states:

"§ 20. *Effect of release on right of contribution.*

A release by the injured person of one joint tort-feasor does not relieve him from liability to make contribution to another joint tort-feasor unless the release is given before the right of the other tort-feasor to secure a money judgment for contribution has accrued, and provides for a reduction, to the extent of the pro rata share of the released tort-feasor, of the injured person's damages recoverable against all other tort-feasors."

In order to be relieved from contributory liability, the released judgment against other tortfeasors must be reduced by the "pro rata share" of the released tortfeasor. The accepted interpretation for that clause when used in a joint tortfeasor release has been that the burden of the judgment is distributed among the joint tortfeasors in numerical shares or proportions based upon the actual number of tortfeasors. The release in this case included that precise language:

"[I]t is agreed that all claims recoverable by us [Lahockis] against ... General Motors Corporation

. . . *are hereby reduced to the extent of the statutory pro rata share* of . . . Campbell . . . under the provisions of the Uniform Contribution Among Tortfeasors Act, Article 50, Sections 16 to 24, inclusive, of the Annotated Code of Maryland (1975 Ed.) . . . ." (emphasis added).

The parties, in adopting this verbatim language in the prejudgment release of a codefendant (who did not deny liability), obviously intended by the use of the term "statutory pro rata share" whatever was intended by the Legislature in the use of that term in § 20, with which the release was intended to comply in order to free the codefendant, Campbell, from further contributory liability. *Swigert v. Welk,* 213 Md. 613, 618 (1957). Wendell D. Allen's "Paper," which appears to have been historically the only source of interpretation available to the Maryland Bar following our adoption of the Uniform Act, proclaims that:

"We all agree, however, that pro-rata share as used in the 1941 Act means that the burden is distributed among joint tortfeasors in numerical shares or proportions based on the actual number of tortfeasors, regardless of whether the plaintiff originally sued two or more defendants or whether a single defendant impleads a third party, for example, 50% each as to two tortfeasors, or $33^{1}/_{3}\%$ each as to three tortfeasors." W. Allen, *supra* at 10.

However, the paper provides no explanation for that conclusion.

The *Swigert* case was the judicial source of the interpretation of "pro rata share" used by the trial judge and, presumably, the parties in this case.[12] There is dicta in *Swigert* which indicates by passing reference that pro rata reduction meant a per person or per tortfeasor reduction as Wendell D. Allen had explained. *Swigert* does not explain (as Allen had not) why this interpretation should be preferred as opposed to a reduction in the final judgment against the

---

12. The language of the section referred to in *Swigert* is the same; the current §§ 19 and 20 were then §§ 23 and 24 respectively.

remaining tortfeasors proportionate to the consideration paid by the released tortfeasor. In *Swigert,* the consideration for the release was $3500. The Court gave the following examples from which it concluded that the Act contemplated a per person reduction:

> "For instance, if the plaintiff's damages be assessed at $4,000 and if the provision of section 23 requiring a reduction in the amount of the consideration paid for the release be applied, the judgment to be entered against Swigert will be $500. If we assume that plaintiff's damages will be determined to be $8,000 and if the *pro rata* reduction authorized in the release be applied, the judgment then entered against Swigert will be $4,000." *Swigert v. Welk,* 213 Md. at 619.

Apparently then, the Court of Appeals fell into the "We" that Mr. Allen proclaims "all agree" on that definition of "pro rata share" which, we again note, was *intentionally* left undefined in the Act. As cross-appellants remarked in their brief, the Commissioner's notes underscore that:

> "This Section does not include a definition of 'pro rata share' although that phrase appears several times in the Act. Although it might be helpful to define this phrase, the draftsmen of the Act feel that in view of the difficulty in stating a concise definition and because of its well-established meaning in various contexts, the attempt of statutory definition would prove to be more harmful than otherwise."

Those "well-established meanings in various contexts," however, vary considerably from that meaning given the term by Mr. Allen, and presumably later accepted in the dicta of *Swigert.* "Pro rata" is a generic term frequently meaning in a proportion *(The American Heritage Dictionary of the English Language),* related in legal use to dollars as often as it is to people.[13] Although definitively broad enough to

---

13. *Black's Law Dictionary* 1364 (4th ed. 1968):

"Proportionately; according to a certain rate, percentage, or proportion. According to measure, interest or liability."

comprehend a per person division, it is not restricted to that meaning. A pro rata clause in an insurance policy, for example, otherwise known as a proportionate recovery clause, is to the effect that an insurer will not be liable for any greater proportion of any loss which may occur than that of the amount named in the policy to the entire assessment of insurance upon the property. *Ballentine's Law Dictionary* 1013 (3rd ed. 1969), quoting 29A Am. Jur. (rev. ed.) *Insur.* § 1707. The provision is also used in automobile insurance policies to limit an insurer's liability when the insured had more than one policy. The provision usually provides that the carrier's liability will not exceed a greater proportion of loss than the applicable limit of liability stated bears to the applicable limit of liability of all valid and collectable insurance against such loss. 7 Am. Jur. 2d *Auto. Insur.* § 200 (1963). A "pro rata contribution" then by its most extended colloquial connotation means no more than an aliquot division, *i.e.,* that no one person will be compelled to bear the whole, or more than his just share of the common binder or obligation.

Our appellate courts, however, have never before been called upon to analyze the statute to determine what was meant by that § 20 requirement that a subsequent judgment be reduced "to the extent of the pro rata share of the released tort-feasor" in order to absolve the released party from further liability. Since the preceding section of the Act, § 19, sets forth a similar requirement of the same release, it would appear more logical that the Legislature intended the two prerequisites to be the same, *i.e.,* a reduction of any subsequent judgment against the remaining tortfeasors in the "pro rata share" of the released tortfeasor. The generic term "pro rata share" was apparently chosen in § 20 to comprehend inclusively either the expressly defined proportionate dollar formula reduction *or* "any other amount or proportion by which the release provides that the total claim shall be reduced" as allowed in the preceding § 19.

"§ 19. *Effect of release on injured person's claim.*

A release by the injured person of one joint tort-feasor, whether before or after judgment, does

not discharge the other tort-feasors unless the release so provides; but *reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides* that the total claim shall be reduced, if greater than the consideration paid." (emphasis added).

That explains the use of different terms in successive sections dealing with the same purpose, without arriving at a divergent meaning that effectuates an absurd result. *Cf. State v. Fabritz,* 276 Md. 416 (1975).

Had the Legislature intended pro rata in § 20 to mean per person rather than in the dollar amount of the release, there would exist not only a purposeless difference, but also the result would deter rather than encourage settlements, a judicial purpose which implicitly undergirded the enactment of the Uniform Act in Maryland. *Cf. Chertkof v. Weiskittel Co., supra.* If, for example, an injured party chose to settle with one joint tortfeasor for his insurance policy limits so as not to destroy that tortfeasor's limited personal assets, he could do so under § 19 by agreeing to reduce any ultimate verdict by the amount received. However, for the released tortfeasor to achieve commensurate protection (*i.e.,* protect his personal assets from contribution by the remaining tortfeasor), the release must compel the injured party to reduce a subsequent judgment, not by what he has received as required by § 19, but by half — if "pro rata share" means a numerical share based upon the number of tortfeasors, as indicated in *Swigert* and stated by Mr. Allen. That result would certainly be neither a reasonable interpretation nor an encouragement to effectuate settlements. *See Chertkof, supra.*

While we are called upon by cross-appellant to construe "pro rata share" as such phrase is used in the Act, the proper question for our deliberation is somewhat more subtle. Cross-appellant concludes the statutory determination to be our role only because the release *contract* agreed to a reduction of the subsequent judgment to the extent of the

"statutory" pro rata share. The real question to be asked then is not what was the Legislature's intent in using pro rata share, but rather what was the intent of the parties to the contract.

The problem becomes not so much the intent of the parties, but the understanding of the parties. The two things undoubtedly were totally different. The *intent* of the parties was to comply with the statutory requirements so as to invoke its benefits with the least cost to themselves. Their *understanding* was that the cost would be what *Swigert* indicated, *i.e.,* a reduction of a subsequent judgment proportioned among the tortfeasors. Therefore, the issue that the trial judge should have addressed was not a *statutory* interpretation of "pro rata share," but rather a contractual interpretation of that term as used.

As pointed out, the contract itself referred to a reduction "to the extent of the *statutory* pro rata share"; however, it is clear that such reference was not intended to await a statutory interpretation, but was intended to convey an express unquestioned understanding of the numerical proportion which, "we all agree," the term pro rata share meant. *See Swigert, supra*; W. Allen, *Joint Tortfeasors, supra.* It is, therefore, apparent that the trial judge did not err by reducing the verdict by half regardless of what was intended by the Legislature in its § 20 use of the term "pro rata share."

We reach this result because of the facial unfairness of the effect of a sudden, unexpected change of definition after long and obvious public reliance upon *Swigert* dicta — despite our recognition that such dicta is not binding upon us. For a similar reason, we now hold that the term "pro rata share" as used in § 20 does, and will continue to, mean that which *Swigert* exemplified it to be, *i.e.,* in numerical shares or proportions based on the number of tortfeasors. That interpretation has been accepted and utilized, and because there is no way to determine whether it has, in fact, deterred rather than encouraged settlements, we will not upset the stability of its understood use over three decades. We might add that the Legislature is presumed to know what judicial

interpretations have been placed upon its statutes. *Criminal Inj. Comp. Bd. v. Gould,* 273 Md. 486, 498 (1975). The *Swigert* definition, by example, has for three decades stood legislatively undisturbed.

We will affirm the judgment of Judge Blackwell as to both appeal and cross-appeal. The costs will be paid in "pro rata shares" by the appellants, Contee, General Motors Corporation, and the cross-appellants, Lahockis. Cross-appellee, Contee, will participate in the costs despite its win since its success was so contractually related to Lahockis' fate.

> *Judgment affirmed.*
> *Costs to be divided equally between General Motors Corporation, George E. and Doris Lahocki, and Contee Sand and Gravel Co., Inc.*