**COLT INDUSTRIES OPERATING COR-
PORATION, QUINCY COMPRESSOR
DIVISION, Appellant/Cross–Appellee,**

v.

**FRANK W. MURPHY MANUFACTUR-
ER, INC., a corporation, Appel-
lee/Cross–Appellant.**

Nos. S–3839, S–3942.

Supreme Court of Alaska.

Dec. 13, 1991.

Theodore M. Pease, Kristi A. Nelson and Peter J. Maassen, Burr, Pease & Kurtz, Anchorage, for appellant/cross-appellee.

Kenneth M. Rosenstein, Lynch, Crosby & Sisson, Anchorage, for appellee/cross-appellant.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This case stems from a wrongful death claim by the estate of Ralph Howard against Colt Industries Operating Corporation (Colt), a compressor manufacturer. Frank Murphy Manufacturer, Inc. (Murphy), which made a component used in Colt's compressor, was a third party defendant in the underlying claim. Colt negotiated a settlement with the Howard estate which released Murphy, Craig Taylor, Colt's distributor, and itself from liability. Colt then sought contribution from Murphy, arguing that Murphy was liable on manufacturing and design defect theories. Colt was unsuccessful in its attempt to establish Murphy's liability; the superior court directed a verdict for Murphy on the issue of design defect, and the jury returned a verdict in favor of Murphy on the manufacturing defect claim. Colt appealed and Murphy cross-appealed. These appeals present four major issues: 1) whether the trial court erred in directing a verdict on Colt's design defect claim; 2) what number of pro rata shares should be counted for purposes of a contribution action; 3)

whether a limitation imposed by the trial court upon Colt's expert's testimony constituted an abuse of discretion; and 4) whether the trial court abused its discretion by permitting Colt's expert to rely on Murphy's business records. We reverse the decision of the superior court as to the first three issues and affirm as to the fourth.

## I. Facts and Proceedings

On March 15, 1983, Ralph Howard was killed while using a sandblaster. A compressor manufactured by Quincy Compressor Division of Colt powered the machine. The compressor also supplied breathing air to Howard, who wore a protective mask and hood when using the sandblaster. While Howard was sandblasting, a fire started in the Colt compressor. Carbon monoxide produced by the fire contaminated Howard's air supply. He died of carbon monoxide poisoning.

Howard's estate initiated a wrongful death action on December 27, 1983. The estate sought damages from multiple parties, including Colt and Craig Taylor, Colt's distributor. On July 11, 1985, Colt filed a third-party complaint against Murphy, the manufacturer of a device known as a model 20–T temperature switch gauge which Colt had installed on the compressor during its manufacture. The function of the switch gauge was to automatically shut down the diesel engine that powered the compressor when the compressed air discharge temperature exceeded a certain level. Such devices are important components because compressors generate substantial heat during normal use, and can easily overheat if any abnormality occurs during operation.[1]

The Murphy switch gauge consists of a bulb attached by a copper capillary tube to a case assembly with a gauge face. It is installed at the hottest area of the compressor. The bulb acts as a sensor; the cavity within it is filled with methylene chloride. As the bulb heats, the methylene chloride boils and converts from liquid to gas, thereby creating pressure. The pressure is hydraulically transferred from the bulb through the capillary to a copper diaphragm at the back of the case assembly. The increasing pressure causes the diaphragm to contract. This movement is conveyed through the case assembly and reflected in a temperature reading on the gauge face. When the temperature reaches the set level, the gauge activates a magnetic switch, cutting off the flow of fuel to the diesel engine and shutting down the machine.

Murphy manufactures the switch gauge by attaching the case assembly to the copper capillary tube which is inserted into one of two holes in the sensor bulb. The bulb is soldered in place with 40/60 (tin-lead) solder. The bulb, capillary tube, and diaphragm are then filled with liquid methylene chloride through the remaining hole in the bulb. When the device is filled to specifications, a brass pin is inserted into the hole in the bulb and sealed in place with 40/60 solder.

The switch gauge in the compressor used by Howard was set to shut the compressor down if the temperature within the compressor exceeded 225° F. It did not activate. The parties agree that the Murphy switch gauge was nonfunctional because the joints around the sensing bulb failed to contain the methylene chloride, but disagree as to whether the leak occurred before or during the compressor fire. Colt theorized that methylene chloride slowly leaked from small cracks in the soldered joints which were undetectable at the time of manufacture.[2] In the opinion of Colt's

---

1. The mere operation of a compressor can generate auto-ignition temperatures. Colt's expert testified that compressor fires are "expectable and predictable." Thus, the reason for using a high temperature shut-off device is to shut the machine down when it begins to overheat before there is damage to the equipment or injury to its operator.

2. Colt's expert explained that at normal temperatures, the cracks in the joint were so small that

methylene chloride could not escape. However, while in operation, the heat of the compressor caused the internal pressure of the bulb to increase until it exceeded atmospheric pressure. The expert concluded that the high pressure within the bulb would expel a small amount of methylene chloride through cracks in faultily bonded joints each time the compressor was operated. The switch gauge in question had been operated for 400–500 hours prior to How-

experts, by the time of the accident, there was too little methylene chloride remaining in the bulb for the switch gauge to function. Thus, while Howard used the sandblaster, temperature in the compressor rose gradually, escalating unchecked due to the failure of the Murphy device, until the fire started and the carbon monoxide which Howard inhaled was produced.

Murphy contended that the switch gauge was operational until a spark ignited the oil in the compressor. According to its theory, the heat of the fire melted the solder seals, allowing vaporized methylene chloride to escape. Thus, Murphy concludes, there was not a causal link between the failure of the switch gauge and Howard's death because the fire started before the gauge failed.

The parties were unable to definitively resolve this dispute because sometime after Howard's death, William Kenton, who was then working on behalf of the Howard estate, removed the Murphy switch gauge from the compressor and took it to the Murphy manufacturing plant. There, with the assistance of Murphy's production supervisor and quality control officer, Kenton tested the device. In the course of testing, the switch gauge was cut apart. Once the joints of the switch gauge had been severed, it was no longer possible to test the device to determine whether there had been a small leak in the bulb joint prior to the fire.

Colt eventually arranged a settlement with the Howard estate which extinguished its own liability as well as that of Craig Taylor and Murphy. Colt paid the sum of $1,620,018. The other defendants who settled independently paid $250,000 in the aggregate.

Colt then sought contribution from Murphy pursuant to former AS 09.16.010–.060. Colt and Murphy each filed motions for summary judgment directed to the number of tortfeasors to be counted for determining Murphy's pro rata share of Colt's settlement. The trial court held that, assuming Murphy was adjudicated a joint tort-

feasor, there would be three pro rata shares: Colt, Craig Taylor, and Murphy.

In January 1990, a jury trial was held on the issue of Murphy's liability as a joint tortfeasor. Colt argued that Murphy was liable for Howard's death in strict products liability under both manufacturing and design defect theories. Murphy moved for directed verdict on Colt's manufacturing and design defect theories. Its motion was granted as to the design defect claim. Subsequently, the jury concluded that the Murphy device did not have a manufacturing defect. Judgment was entered in favor of Murphy on February 7, 1990. This appeal followed.

## II. Directed Verdict

### A. Standard of Review

In *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216 (Alaska 1978), we defined the standard of review regarding a motion for directed verdict:

> [T]he proper role of this court, on review of motions for directed verdict . . . is not to weigh conflicting evidence or judge the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable men could not differ in their judgment.

The test is objective; and, if there is room for diversity of opinion among reasonable people, the question is one for the jury. Further, all favorable inferences are to be accorded the non-moving party.

*Id.* at 220 (quoting *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974)) (footnotes omitted).

### B. Design Defect

■ Colt claims that the use of 40/60 solder seals on Murphy's switch gauge was a design defect and therefore, Murphy was strictly liable in tort for marketing the switch gauge.

---

ard's accident. Colt claimed that enough methylene chloride could have leaked during those

400–500 hours to make the device nonfunctional.

In Alaska, a "manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." *Clary v. Fifth Avenue Chrysler Center, Inc.*, 454 P.2d 244, 247 (Alaska 1969) (citations omitted). In *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (Alaska 1979), we set forth two methods by which plaintiffs can prove strict liability on the ground that a product is defectively designed. Colt attempted to satisfy the second test which applies to situations in which "the product satisfies ordinary consumer expectations as to its general use but is still 'defective' in that its design exposes the user or bystander to 'excessive preventable danger.'" *Id.* at 885 (citations omitted). Specifically, the test states that a product is defectively designed if:

> [T]he plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.

*Id.* at 886.

In *Dura Corp. v. Harned*, 703 P.2d 396 (Alaska 1985), we interpreted the second *Beck* test for design defect claims in light of the trial court's grant of a directed verdict in favor of the plaintiff. We explicitly stated that under *Beck*, "the plaintiff must establish a *prima facie* case by introducing sufficient evidence to permit a jury to find that the product's design features were a proximate cause of plaintiff's injury." *Dura*, 703 P.2d at 406. We further noted that proximate cause may be shown by establishing that "the defective product was more likely than not a substantial factor in bringing about the plaintiff's injury." *Id.; see also Campbell v. General Motors Corp.*, 32 Cal.3d 112, 184 Cal.Rptr. 891, 649 P.2d 224 (1982). Finally, as to the directed verdict, we stated "[t]he issue of proximate cause is normally a question of fact for the jury to decide and becomes a

matter of law only where reasonable minds could not differ." *Dura*, 703 P.2d at 406 (citation and footnote omitted).

Colt argued that Murphy's design for sealing the sensor bulb with 40/60 soldered joints was defective for three reasons. Its primary theory was that the 40/60 solder seals used by Murphy were unreliable. Colt's expert, John Weiss, explained that Murphy's soldering was performed manually. He stated that since hand-finishing makes it difficult to achieve a uniform product, this process could result in what is known as a "cold joint" (a joint which does not totally bond when initially formed). Weiss explained that cold joints are prone to leaks. Moreover, these leaks cannot be detected at the time of manufacture. Weiss also testified that his examination of the distribution of solder on the joints of the device confirmed his opinion that the joints had not bonded properly.

Secondly, Colt presented evidence that the combination of three different metals in 40/60 solder was a design defect. Weiss testified that each metal has different expansion, corrosion and resistance characteristics. Thus, as combination metals are heated and cooled with use, joints weaken so that "it's just a question of how many times [they] will last until [they] fracture[ ]." This phenomenon is called "thermal cycling."

Finally, Colt argued that even assuming the device was operational when the fire started and that the fire melted the solder, Murphy's design was defective because 40/60 solder melts at a low temperature, allowing leakage of methylene chloride at exactly the time it is most needed to activate the switch gauge. Although this argument was inconsistent with Colt's theory of the accident,[3] Colt raised it to illustrate that even under Murphy's theory, the design of its switch gauge was defective.

In support of Colt's design defect theory, Weiss testified that he had reviewed product return documents received by Murphy

**3.** If methylene chloride did leak prior to the fire, the melting temperature of 40/60 solder would be irrelevant since there would be no causal connection between the solder melting and Howard's death.

during a one-year period and found several other instances where methylene chloride had escaped from Murphy's safety devices which did not have visible defects. He interpreted these documents to substantiate his belief that due to the 40/60 solder seal design, Murphy's switch gauges are susceptible to undetectable leaks.

In addition, Colt presented evidence that alternative manufacturing processes were available.[4] Weiss stated that both silver solder and welded seals would be feasible and preferable. The manufacture of welded seals can be programmed so identical amounts of current are introduced into each joint. Thus, uniform joints are produced, making leaks less likely than with soldered joints. In addition, welded seals are not susceptible to thermal cycling because they are constructed of homogeneous material. Moreover, they can withstand extremely high temperatures without melting. With respect to silver soldering, Weiss testified "brazing alloys [such as silver] tend to be less viscous than solders and will run into smaller cavities and make, in fact, a better seal." Furthermore, there was evidence that it would not be any more difficult to solder with silver than with 40/60 solder. Finally, Weiss stated that silver solder can withstand far higher temperatures than 40/60 solder (1200–1400°F as compared with 361–460°F).

Murphy maintains that the evidence Colt presented failed to establish a *prima facie* case of design defect as to any of Colt's theories as to the cause of the device's failure. First, Murphy characterizes cold joints as production errors. It argues that such "deviation[s] from the condition intended by the manufacturer" should be defined as manufacturing rather than design defects. *Beck*, 593 P.2d at 878 n. 15. Additionally, Murphy contends "some processes may be more subject to errors than others, but to argue that a certain process constitutes a design defect because it might be more prone to errors than some other process serves only to blur the distinction between design and manufacturing defects to the point of disappearance."

█ The delineation between design and manufacturing defects is undoubtedly blurry. However, we have long recognized that overlap between the two categories is unavoidable. We have clearly stated that rigid delineation of the two categories is neither necessary nor desirable. In *Beck* we specified:

> Manufacturing defects and design errors are not mutually exclusive.... As the California court noted in *Cronin*, whether a defect results from manufacture or design is not always obvious.... The categories not only overlap, but they may also operate simultaneously or be alleged in the alternative."[5]

593 P.2d at 878 n. 15 (citation omitted).

Here, the two theories operate simultaneously; we see no reason to arbitrarily assign defects resulting from processes which are prone to error to one category or the other. Colt introduced sufficient evidence to enable reasonable jurors to con-

---

**4.** Although this evidence was not a necessary element of Colt's case because the *Beck* test places the burden on the defendant to prove that "on balance the benefits of the challenged design outweigh the risk of danger inherent in such design," it bolstered Colt's claim by providing a basis for comparing the design used by Murphy with other available designs. *Beck*, 593 P.2d at 886.

**5.** In *Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972), the California Supreme Court stated:

> [A] distinction between manufacture and design defects is not tenable.... The most obvious problem we perceive in creating any such distinction is that thereafter it would be advantageous to characterize a defect in one rather than the other category. It is difficult to prove that a product ultimately caused injury because a widget was poorly welded—a defect in manufacture—rather than because it was made of inexpensive metal difficult to weld ...—a defect in design.... We wish to avoid providing such a battleground for clever counsel.

*Id.* 104 Cal.Rptr. at 443, 501 P.2d at 1163.

While we recognize that in certain circumstances it may be useful to describe products liability claims in terms of design and manufacturing defects, we share the *Cronin* court's belief that a plaintiff who successfully establishes that a product is defective should not be subjected to the additional burden of proving whether the precise cause of a defect was in the product's design or its manufacture.

clude that 40/60 solder was prone to leaks and that Murphy's design decision to use it was a proximate cause of Howard's death.

Although this determination alone is a sufficient basis to reverse the trial court's directed verdict, to guide the court's consideration of Colt's design defect claim on remand, we will also address Murphy's arguments that Colt failed to make a *prima facie* case as to its thermal cycling and low melting point theories.

■ Murphy contends that because there was not definitive proof that thermal cycling occurred in this case, there was no basis on which the jury could conclude that thermal cycling was the proximate cause of Howard's death.[6] However, in light of the fact that it was impossible to conclusively determine how the methylene chloride escaped due to the joints of the sensor bulb having been severed, expert testimony with respect to the particular switch gauge at issue was unavoidably speculative. Weiss described a known phenomenon, which he viewed as "something to avoid in design." On the basis of the components of the solder used by Murphy, he considered thermal cycling to be a plausible explanation for the switch gauge's failure. While Murphy's objections may diminish the persuasiveness of Weiss' testimony, in reviewing a directed verdict the evidence must be viewed in the light most favorable to the non-moving party. Given these conditions, we conclude that Weiss' testimony was sufficient to create a question of fact as to

whether thermal cycling was the cause of the Murphy device's failure.

■ Lastly, Murphy contends that because Colt argued that the device was nonfunctional prior to the time the fire started, the jury could not have found that the low melting point of 40/60 solder had any causal connection to the accident. Yet, Alaska Civil Rule 8(e)(2) permits parties to set forth arguments in the alternative. Colt presented evidence which showed that even if Murphy's theory was correct (i.e. that methylene chloride did not escape until the heat of the fire melted the seals), a reasonable jury could nonetheless have concluded that the selection of 40/60 solder over other available seals was a design defect because of its low melting temperature. The jury should have been permitted to consider this theory.[7]

Thus, Colt introduced evidence which, even under Murphy's theory of the cause of the fire, linked the design of the Murphy switch gauge to Howard's death.[8] Viewing the evidence in a light most favorable to Colt, there can be no question that Colt made a *prima facie* showing that the design of Murphy's high temperature shut-off device with 40/60 solder seals on the sensor probe was a legal cause of the methylene chloride leak, the fire, and Howard's death. The burden of disproving a design defect should have been shifted to Murphy. *See Dura*, 703 P.2d at 406. We reverse the directed verdict against Colt and remand for a new trial on the issue of design defect.

**6.** Weiss acknowledged that fatigue induced by thermal cycling occurs over an indeterminate period of time, and that he did not know whether it had actually occurred in this case.

**7.** Murphy also suggests that the melting point argument must fail because silver soldered seals were available to Colt from Murphy, and as a component manufacturer, it is not responsible for inappropriate design decisions made by manufacturers of devices into which the component is incorporated. *See, e.g., Taylor v. Paul O. Abbe, Inc.*, 516 F.2d 145 (3d Cir.1975).

There is no factual basis in the record to decide this issue, and we express no opinion as to the merit of Murphy's claim. However, to avoid confusion in the event that this issue arises upon retrial, we note that Murphy's argu-

ment is properly framed as an assertion of superseding cause. While this court has not directly addressed the question of when component manufacturers are liable for improper use of their products, we have held that the defense of superseding cause is applicable to products liability cases. *Dura*, 703 P.2d at 402. In *Dura* we further ruled that the standard to be applied is whether, in retrospect, it appears "highly extraordinary" that the negligent conduct would have brought about the harm. *Id.* (citing *Yukon Equipment, Inc. v. Gordon*, 660 P.2d 428 (Alaska 1983)).

**8.** These facts are analogous to the facts in *Dura* in which the thinness of a portable air tank caused the tank to fail under both the plaintiff's and the manufacturer's theories of the accident.

### III. Evidentiary Issues

#### A. Standard of Review

■ The standard for appellate review of a trial court's decision on admissibility of evidence is whether the court abused its discretion. *Dura,* 703 P.2d at 409. We will find that the trial court abused its discretion only "when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." *Id.* (citation omitted).

#### B. Alaska Rule of Evidence 702

■ Herbert Brown testified for Colt as an expert on air compressors. Murphy did not challenge Brown's expertise as to compressors; however, it objected to his testimony about the failure of the Murphy device. The trial court sustained Murphy's objection on the ground that the "device in question here" was not in the area of Brown's expertise.[9] Colt argues that the trial court abused its discretion by excluding Brown's testimony.

Alaska Rule of Evidence 702 concerns testimony of expert witnesses. It provides in relevant part:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

We have construed Rule 702 to require "simply that the witness' special knowledge must assist the trier of fact to understand the evidence or determine a fact in issue." *Norris v. Gatts,* 738 P.2d 344, 350 (Alaska 1987). Colt argues that Brown had this expertise, and that he should have been permitted to testify as to why he believed the 40/60 solder seals on the Murphy device were defective.

Murphy maintains its objection to Brown's testimony chiefly on the ground that Brown's background reflected general experience in the broad field of engineering rather than specific experience in evaluating the quality of solder seals. In support of this claim, Murphy emphasizes that Brown's soldering experience is limited to "cold soldering" of electrical parts, whereas the parts in Murphy's switch gauge were preheated before soldering.

We decline to hold that Rule 702 demands expertise in *precisely* the area upon which the expert proposes to comment. Furthermore, we conclude that in this case Brown's background in mechanical engineering enabled him to assist the jury in evaluating the design of the Murphy device. Brown has a bachelor of science degree in marine engineering, which is nautically-applied mechanical engineering. He also has extensive experience in mechanical engineering; he was employed in various engineering positions for approximately twenty years. He worked for Colt in its compressor division for approximately six years during which time he was promoted to vice president of product engineering and quality assurance.

■ Murphy alternatively contends that the court did not abuse its discretion by excluding the testimony because Brown shared Weiss' opinion that the bulb was improperly soldered. Therefore, it argues, the testimony of experts Brown and Weiss would have been cumulative and exclusion of Brown's opinion was harmless error.

We reject this argument as well. Brown's testimony went to a material issue of Colt's case. Although he reached the same conclusion as did Colt's other expert, the mere fact that another witness has

---

**9.** There appears to be some confusion about the scope of the trial court's ruling. Colt claims it was prevented from questioning Brown regarding the operation of switch gauges, while Murphy insists that the exclusion applied exclusively to Brown's testimony concerning the particular device.

The transcript supports Murphy's position. Brown was permitted to testify as to the function of the Murphy device. Additionally, during cross-examination he was allowed to describe his evaluation of high temperature shutdown switches. Accordingly, we interpret the court's instruction as restricting Colt only insofar as it was not permitted to question Brown about the Murphy device in the compressor used by Howard.

already testified as to a certain issue does not foreclose a litigant's right to introduce substantiating testimony. Juries may find one witness more compelling than another, or they may attribute greater weight to a finding if more than one expert reaches the same conclusion.

In light of the importance of the issue to Colt's case, we conclude that the exclusion of Brown's testimony as to the reason for the Murphy device's failure prejudiced Colt's right to a fair trial.[10] Accordingly, its ruling is reversed. During retrial of Colt's design defect claim, Colt must be permitted to question Brown concerning the Murphy device.

### C. Business Records

■ Colt's expert, John Weiss, testified concerning Murphy's product return documents. Weiss relied on these records to substantiate his opinion that the 40/60 sol-

der seal design makes Murphy's devices susceptible to undetectable leaks.[11]

During trial, Murphy objected to Weiss' reliance on the records on the ground that they were inadmissible hearsay[12] and that they did not contain enough information to justify Weiss' reliance. Murphy now asserts that the trial court abused its discretion by admitting Weiss' testimony pertaining to the records. However, Alaska Rule of Evidence 703[13] allows an expert witness to rely on inadmissible evidence to undergird his or her opinion if the facts and data underlying the expert's opinion are those reasonably relied upon by experts in the field. The reasonableness of Weiss' reliance on the return reports is judged by reference to the six factors set forth in *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F.Supp. 1313, 1330 (E.D.Pa. 1980), which we followed in *Norris v. Gatts*, 738 P.2d 344, 351 (Alaska 1987).[14]

---

10. *See Dickey v. Corr–A–Glass*, 3 Kan.App.2d 721, 601 P.2d 691, 694 (1979) ("The exclusion of the testimony of plaintiffs' expert witness went to the heart of their case and substantially prejudiced their right to a fair trial.").

11. Of the seven documents upon which Weiss' opinion was based in part, three report "[n]o movement." Three additional records do not indicate the problem with the switch gauges other than that they required repair and were given new sensing bulbs, calibrated, and returned to the customer. The final document states that the switch gauge would not register temperature. In the area designated for "remarks" it states: "Calibration checks—Contact checks."

12. Although the reports were business records, their admissibility under Alaska Rule of Evidence 803(6), which exempts business records from the hearsay rule, is questionable. Because the reports appear to contain hearsay in the form of customers' descriptions of the problem with the returned devices, they may involve hearsay included within hearsay, and would therefore be inadmissible absent an independent hearsay exception. *See* Alaska R.Evid. 805; *see also Wolf v. Procter & Gamble Co.*, 555 F.Supp. 613 (D.N.J.1982).

13. Rule 703 provides:
    *Basis of Opinion Testimony by Experts.*
    The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. Facts or data

need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

14. The *Zenith* factors are:
    1. The extent to which the opinion is pervaded or dominated by reliance on materials judicially determined to be inadmissible, on grounds of either relevance or trustworthiness;
    2. The extent to which the opinion is dominated or pervaded by reliance upon other untrustworthy materials;
    3. The extent to which the expert's assumptions have been shown to be unsupported, speculative, or demonstrably incorrect;
    4. The extent to which the materials on which the expert relied are within his immediate sphere of expertise, are of a kind customarily relied upon by experts in his field in forming opinions or inferences on that subject, and are not used only for litigation purposes;
    5. The extent to which the expert acknowledges the questionable reliability of the underlying information, thus indicating that he has taken that factor into consideration in forming his opinion;
    6. The extent to which reliance on certain materials, even if otherwise reasonable, may be unreasonable in the peculiar circumstances of the case.
    *Norris*, 738 P.2d at 350–51 (quoting *Zenith*, 505 F.Supp. at 1330).

Applying the *Zenith* factors to Weiss' testimony, we find that his reliance upon Murphy's return reports was reasonable. Clearly, Weiss' overall testimony was not dominated by reliance on inadmissible or untrustworthy materials, nor were his assumptions shown to be unsupported or speculative.[15] It is also reasonable for an expert who is seeking to determine the explanation for the failure of a device, such as the switch gauge, to examine the manufacturer's records of repairs to identical devices.[16] The reports were not prepared for litigation purposes, but were "part of Murphy's operating procedure and its function." Weiss reviewed multiple return reports, selecting only those in which an unexplained leak was the reason for the return. Finally, there is no reason why reliance on the reports was unreasonable in this particular case. On the contrary, in light of the fact that tests to determine the existence of leaks in the solder seals could not be performed on the Murphy device in question, reliance on extrinsic evidence of such defects appears both reasonable and unavoidable.

Furthermore, the alleged absence of information in the return reports pertaining to the manner in which the returned devices had been used and other reasons for their failure or return could have been tested on cross-examination. If, as Murphy claims, there was "not the slightest bit of evidence indicating a similarity in the failures of the switch gauge installed on Colt's compressor and those referred to in the documents Mr. Weiss testified about," cross-examination could have raised serious questions about the reasonableness of Weiss' reliance on the reports and potentially diminished his overall credibility.

The trial court did not abuse its discretion by permitting Weiss to rely upon Murphy's return reports. Its ruling is therefore affirmed.

## IV. Contribution Issues

There were four defendants and three third-party defendants to the underlying wrongful death action brought by Howard's estate. The complaint against one third-party defendant, AMOT, was dismissed. Colt negotiated a settlement of the wrongful death suit with the Howard estate which extinguished its own liability as well as that of Murphy and Colt's distributor, Craig Taylor. Three other defendants to the underlying action, Jackovich, Totem, and Empire, entered into separate settlement agreements with the Howard estate.

Following resolution of the Howard estate's claims, Colt sought contribution from Murphy. Colt and Murphy each filed motions for summary judgment on the issue of how many tortfeasors should be counted in determining Murphy's pro rata share of Colt's settlement, assuming Murphy was adjudicated a joint tortfeasor.[17] Murphy argued that there were six shares: Colt, Craig Taylor, Jackovich, Totem, Empire,

15. Murphy argues that Weiss' assumptions were speculative. It compares Weiss' use of the documents to a report which was at issue in *Zenith*, 505 F.Supp. at 1337–38. In *Zenith* the report concluded, solely on the basis of a statement made by one executive, that "the companies sought to avoid competition with one another when adding to production capacity." *Id.* at 1338. The court held that this statement alone was not a reasonable basis for "such a sweeping conclusion ... nor is it helpful to the jury, in that there has been no application of expertise." *Id.* In contrast, Weiss relied on multiple written reports. Furthermore, these reports were not the sole basis for his conclusion, but merely substantiated the opinion he reached based upon the application of his expertise and other clearly admissible evidence.

16. Murphy strongly urges us to conclude that Weiss' reliance was improper because none of the records explicitly state that there were leaks in the switch gauges which were returned. However, the presence of leaks can be deduced from the information contained in the reports. Weiss considered only reports which indicated that there was no observable damage, yet the device had "lost [its] fill." When other explanations for the malfunction, such as consumer abuse, were present, they appear to have been specifically noted. Weiss excluded such reports.

17. In *Ogle v. Craig Taylor Equip. Co.*, 761 P.2d 722, 725–26 (Alaska 1988), this court set forth six elements which must be established for a successful contribution claim. Murphy admits that the only one of these elements which remains to be resolved is whether Murphy was a tortfeasor, jointly and severally liable for Howard's death.

and Murphy. Colt's position was that there were only two shares, Colt and Murphy. The trial court rejected both positions, and concluded that there were three shares: Colt, Craig Taylor, and Murphy. Both Murphy and Colt appeal the trial court's determination.

The contribution obligations of these parties are governed by former AS 09.16.010–.060.[18] Former AS 09.16.010 provides in relevant part:

(a) ... where two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them....

(b) The right of contribution exists only in favor of a tortfeasor who has paid more than that tortfeasor's pro rata share of the common liability, and the total recovery of that tortfeasor is limited to the amount paid in excess of the pro rata share. No tortfeasor is compelled to make contribution beyond the tortfeasor's pro rata share of the entire liability.

### A. Common Liability

■ Murphy argues tortfeasors should not be omitted from share determination merely because they have settled and are shielded from contribution by operation of former AS 09.16.040.[19] Murphy asserts that the terms "common" and "entire" liability used in former AS 09.16.010(b) "must be established at the moment the tort occurs" and "include all parties incurring legal responsibility for a tortious injury."[20] Although AS 09.16.040(2) prevents tortfeasors who have settled from being required to contribute, Murphy asserts that even tortfeasors who have settled are part of the "common liability" for the purpose of determining the number of pro rata shares in a contribution action. Thus, since Jackovich, Totem, and Empire were named in the underlying action, Murphy reasons that there were six pro rata shares. It asserts that requiring contribution in excess of one sixth of the total amount of all settlements would constitute "comp[ulsion] to make contribution beyond [its] pro rata share of the entire liability" in violation of former AS 09.16.010(b).

■ We find Murphy's argument strikingly inconsistent with former AS 09.16.040 which was adopted for the specific purpose of encouraging settlement.[21] Therefore, in order to serve that purpose,

---

18. Former AS 09.16.010–.060 governs the contribution issues presented in this case. Although that statute was repealed by 1987 Initiative Proposal No. 2, § 2, the repeal applies only to actions accruing after March 5, 1989. 1987 Initiative Proposal No. 2, § 4; *Ogle v. Craig Taylor Equip. Co.*, 761 P.2d 722 (Alaska 1988).

19. Former AS 09.16.040 provided:

When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death

(1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

(2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

20. Murphy also argues that the terms "common liability" and "entire liability" mean the same thing in AS 09.16.010(b). This seems distinctly unlikely as the term "common liability" defines a contributing defendant's share of liability, whereas the term "entire liability" caps the contributing defendant's share of liability. If the terms were meant to be identical, the limiting function which is performed by the last sentence of AS 09.16.010(b) would not be necessary. However, neither party places any significance on the possibility that these terms may have different meanings, and we assume therefore that any difference in meaning which they may have is not significant in this case.

21. The lack of merit of Murphy's argument is well illustrated by examples set forth by Colt:

In this case, potential tortfeasors Jackovich, Empire, and Totem settled for $250,000; Colt settled for $1,620,018. The entire liability was therefore $1,870,018, one-sixth of which was $311,670. If Murphy pays no more than that, Colt pays the remaining $1,308,348 of the settlement.

If Colt had settled for $1,000,000, the entire liability would have been $1,350,000, one-sixth of which is $208,333. If Murphy pays no more than that, Colt pays the remaining $791,667.

unless a settlement is shown to be unreasonable and thereafter set aside, a settling tortfeasor must not be considered in determining the number of pro rata shares available for each remaining tortfeasor's individual liability. Under these circumstances the provisions set forth in former AS 09.-16.010(a) & (b) concerning the concepts of "common liability" and "pro rata share of the entire liability" become inoperable and inapplicable to the settling tortfeasor. This is so because the provisions of former AS 09.16.040(2) control and completely discharge the settling tortfeasor for any purpose whatsoever. Conversely, the remaining viable tortfeasors, who have not negotiated a settlement under former AS 09.16.-040(1) & (2) and who still remain in the lawsuit,[22] will now comprise the total number of viable tortfeasors that can be considered and included in determining common liability for each of these tortfeasors' pro rata share of the entire liability remaining under former AS 09.16.010(a) & (b).

We conclude that the trial court properly determined that Jackovich, Empire, and Totem could not be considered or counted as tortfeasors in determining the pro rata shares of common liability for purposes of deciding Colt's contribution action against Murphy.

### B. Contribution by Non–Negligent Retailer

■ Colt argues that the collective liability of Colt, as manufacturer of the compressor, and Craig Taylor, as distributor of Colt's compressor, should be treated as a single share for purposes of contribution. Colt argues that Craig Taylor's liability to the Howard estate was imputed based exclusively on its position in the chain of distribution of the compressor. We agree.

Craig Taylor's contribution share drops out because, under a strict liability theory, Craig Taylor is entitled to indemnification from Colt. Here, the complaint included a general allegation of negligence, which Murphy now wants to impute to Craig Taylor. In the absence of any evidentiary basis to hold Craig Taylor liable based upon its own independent negligent conduct, a mere allegation of negligence in a complaint against Craig Taylor is legally insufficient to establish liability, and thus is irrelevant. It is clear that Craig Taylor cannot be considered as a viable tortfeasor for the purpose of being counted as one of the pro rata share contributors under former AS 09.16.010(a) & (b). Craig Taylor's liability here can only be established through the chain of distribution as the local retailer of the manufacturer's product, and not by any negligent conduct on its part which legally caused the plaintiff's injuries. Here, Craig Taylor's tortfeasor status for purposes of computing pro rata shares disappears and in effect merges completely into one share, namely that of the manufacturer, Colt.

The superior court concluded that Craig Taylor was not negligent. Therefore, we

---

If Colt had settled for $250,000, the entire liability would have been $500,000, one-sixth of which is $83,333. If Murphy pays no more than that, Colt pays the remaining $166,667.

If Colt had settled for $125,000, the entire liability would have been $375,000, one-sixth of which is $62,500. *If Murphy pays that amount, Colt and Murphy share equally in the cost of settlement.*

. . . .

Thus, under Murphy's analysis, it is only if Colt had settled for exactly $125,000 that Murphy and Colt would have shared the cost equally. But Colt and Murphy have agreed that a much greater amount—$1,620,018— reasonably represents the damages outstanding after the Jackovich, Empire and Totem settlements. The only amount of settlement in which the parties would have shared equally—$125,000—not only would have been re-

jected by the plaintiff, unquestionably, but it also is nearly $1.5 million *less* than what both Colt and Murphy agree is reasonable. Under Murphy's analysis Colt *cannot* settle for a reasonable amount unless it resigns itself to paying over four times as much as Murphy. This result is absurd, and it must be avoided.

**22.** *Cf. Continental Ins. Co. v. Bayless & Roberts, Inc.,* 608 P.2d 281 (Alaska 1980). In *Continental,* two parties agreed to a settlement which was reduced to a consent decree but was treated as a settlement. The insurer of one party sought to reduce its obligation pursuant to former AS 09.16.040(1) by the amount of previous settlements with two other parties. We refused, noting that prior settlements had already been taken into consideration in reaching the reasonable amount for the consent decree.

reverse the superior court's ruling that there were three shares to prorate. If, after a retrial, Murphy is found to be a joint tortfeasor, then there will be two pro rata shares, namely Colt and Murphy, for division purposes.

The decision of the superior court is AFFIRMED in part, REVERSED in part, and REMANDED.

COMPTON, Justice, dissenting in part.

I find the court's analysis of common liability (Part IV A.) unpersuasive and therefore dissent from it. In all other respects I agree with the court's opinion.

The court concludes that there are two pro rata shares to be included in the equation in dividing liability between Colt/Craig Taylor and Murphy, based on its perception that Murphy's argument under former AS 09.16.010 is somehow inconsistent with former AS 09.16.040. The only inconsistency is of the court's own making. It creates two categories of tortfeasors, one of whom is designated a "viable" tortfeasor "that can be considered and included in determining common liability for each of these tortfeasor's pro rata share of the entire liability remaining under former' AS 09.16.010(a) & (b)." The other is designated the "settling" tortfeasor to whom the provisions of former AS 09.16.010(a) & (b) become "inop-erable and inapplicable," and for whom former AS 09.16.040(2) "control[s] and completely discharge[s] ... for any purpose whatsoever." No authority is cited to support the court's designation of "viable" and "settling" tortfeasors. Furthermore, I do not understand what is meant by the "common liability for each ... tortfeasor's pro rata share of the entire liability...."

First, there is no language in former AS 09.16.040(2) which precludes or even suggests that a settling tortfeasor cannot be included in the equation to determine the number of shares in the entire liability. Subsection (2) discharges the tortfeasor from all liability for contribution. Including that tortfeasor in the equation does not impose upon that tortfeasor any liability whatsoever for contribution.

Second, I believe that the court and Colt take a wrong turn in their treatment of pro rata shares of "common liability" and "entire liability." Each term appears once in separate sentences in former AS 09.16.-010(b), and "entire liability" again in former AS 09.16.020.[1] Neither term is defined in the statute.[2] Nothing compels the conclusion that "pro rata share of the common liability" necessarily means the same as "pro rata share of the entire liability." It may or it may not.[3]

---

**1.** Former AS 09.16.020 provides:

In determining the pro rata shares of tortfeasors in the entire liability
(1) their relative degrees of fault shall not be considered;
(2) if equity requires, the collective liability of some as a group constitutes a single share; and
(3) principles of equity applicable to contribution generally shall apply.

**2.** The court notes Murphy's claim that "common liability" and "entire liability" are synonymous, and Colt's apparent lack of disagreement with that position. Thus the court assumes that any difference between the terms "is not significant in this case." Op. at p. 935, note 20. I do not agree that the terms are synonymous, or that we should accept the parties' apparent agreement that they are. Since we are interpreting a statute, we must apply our independent judgment. We should not base our interpretation on an underlying interpretation which the parties assume to be correct, but which we do not independently examine ourselves. I am gratified to

note that the court itself does not believe the terms are synonymous, though perplexed that it nonetheless proceeds on the assumption that they are.

**3.** I suggest that the following are examples of "common liability" and "entire liability."

(1) P sues A, B, C, D, and E. All defendants are solvent. None settle. A jury finds all defendants jointly and severally liable to P. Their liability is "common" to each other. Their common liability is also the "entire liability" to P.

(2) The same parties as in (1), but A, B and C settle separately with P. A jury finds D and E jointly and severally liable to P. The amounts paid by A, B and C are deducted from the amount for which D and E are found liable to P by the jury. D and E's liability is common to each other. However, the entire liability to P is the total of the amounts paid P by A, B, and C, plus the amount of the judgment owed P by D and E.

(3) The same parties as in (1), but A, B and C settle separately with P. D settles with P for

The official commentary to the uniform act does not provide an answer. The problem is compounded: (1) the 1939 version of the uniform act was amended substantially in 1955; (2) state statutes are far from uniform; (3) case law is not extensive. However, case law does suggest that the court's construction is incorrect.

Maryland's comparable statute is entitled the Uniform Contribution Among Tort-Feasors Act. Sections 19 and 20 of the act resemble, but are not identical to comparable sections of our statute.[4] In *Lahocki v. Contee Sand & Gravel Co.*, 41 Md.App. 579, 398 A.2d 490, 513–14 (1979), *rev'd on other grounds*, 286 Md. 714, 410 A.2d 1039 (1980), Section 20's provision for "a reduction, to the extent of the pro rata share of the released tort-feasor," was held to mean "in numerical shares or proportions based on the number of tortfeasors." *Id.* 398 A.2d at 514. Murphy advances this same argument here.

The Maryland court does not trace this definition of pro rata to any conscious effort in earlier decisions to glean legislative intent. Oddly, its genesis seems to have been a lecture given to the Barristers Club of Baltimore by a Baltimore Bar member, who commented that "[w]e all agree" that pro rata means shares based on the number of tortfeasors. The lecturer's comment became the customary practice. *See Id.* at 511–13. In *Lahocki* it was argued that by defining pro rata to mean numerical shares based on the number of tortfeasors, the act's objective of encouraging settlements was subverted. However, the court found no evidence that the objective was subvert-

ed in any manner by this definition and customary practice. The court commented that "there is no way to determine whether it has, in effect, deterred rather than encouraged settlements...." *Id.* at 514. The court let the definition stand. The court reaffirmed the definition in *Chilcote v. Von Der Ahe Van Lines*, 55 Md.App. 291, 462 A.2d 536 (1983).

In *Theobald v. Angelos*, 44 N.J. 228, 208 A.2d 129 (1965), the New Jersey Supreme Court interpreted New Jersey's Joint Tort-feasors Contribution Law. Like Maryland's act, it resembles, but is not identical to, the Alaska statute. *See* N.J.Stat.Ann. § 2A:53A–3 (West 1987). In *Theobald* the plaintiff settled with one of three defendants prior to trial. However, a cross-claim had been filed against that defendant, so when the case went to trial, the jury was asked whether that defendant was a tortfeasor. That defendant was found not liable. A retrial against another defendant was held on the issue of damages. The retried defendant sought pro rata reduction of the second verdict, and included all three defendants in the equation. The court held that the defendant found not liable in the original trial was not a tortfeasor for purposes of New Jersey contribution law. *Id.* 208 A.2d at 131. However, both the opinion of the court and the dissent of Justice Francis assume that but for the finding of no liability on the part of the one defendant, that defendant would have been included in the equation and pro rata reduction ordered, irrespective of the settlement amount paid by that tort-feasor. *See Id.* at 134, 137. No tortfeasor would have been required to pay more than

---

D and E. In a trial between D and E, a jury finds that D and E are jointly and severally liable to P, and hence D entitled to contribution from E. D and E's liability is common to each other. However, the entire liability to P is the total of the amounts paid P by A, B, C, and D.

**4.** Section 19 provides:

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by

which the release provides that the total claim shall be reduced, if greater than the consideration paid.

Md.Ann.Code art. 50, § 19 (1991).

Section 20 provides:

A release by the injured person of one joint tort-feasor does not relieve him from liability to make contribution to another joint tort-feasor unless the release is given before the right of the other tort-feasor to secure a money judgment for contribution has accrued, and provides for a reduction, to the extent of the pro rata share of the released tort-feasor, of the injured person's damages recoverable against all other tort-feasors.

Md.Ann.Code art. 50, § 20 (1991).

one third of the damages found by the jury.

Colt agrees with Murphy that "a 'common' or 'entire' liability is created at the instant a plaintiff suffers injury." Colt then demonstrates how the common liability created in that instant is extinguished by a good faith settlement by a tortfeasor and correctly concludes that the settling tortfeasor cannot be required to contribute "to any other tortfeasor" more than already paid. However, Colt's argument avoids attempting to explain what is meant by "entire liability."

Colt criticizes Murphy's argument by asserting in Section III A. 2. of its Brief of Cross–Appellee that "Murphy's Analysis Leads to Absurd Results And Discourages Settlement." Colt correctly states that *a* purpose of the 1955 amendments to the uniform act was to eliminate provisions of the 1939 act which were seen as deterring settlement. This court then reinterprets Colt's statement and says that "AS 09.16.-040 ... was adopted for the specific purpose of encouraging settlement." Colt's statement of *a* purpose of the act does not compel its interpretation of the entire act. This court's reinterpretation is not correct. As this court noted in *Criterion Insurance Co. v. Laitala,* 658 P.2d 112 (Alaska 1983), "we find it useful to underscore that the purpose of the [Uniform Contribution Among Tortfeasors] Act is to ensure that all joint tortfeasors pay their fair share of the damages rather than to have only one joint tortfeasor pay all the damages." *Id.* at 115. That remains its purpose today.

Colt's parade of self-serving hypotheticals presumably shows the absurd results certain to follow if Murphy's interpretation is adopted.[5] A hypothetical is only as good as the information upon which it is based; in this case, the hypotheticals assume or omit too much. Colt's first hypothetical is an example:

Assume, for example, that P sues A, B, C, and D. A settles on behalf of both himself and B and sues B for contribution. Under Murphy's analysis, even if B stipulates that the settlement represents the amount of damages for which A and B were potentially liable, A cannot know how much B owes until the initial "common liability"—the sum of all the judgments and settlements involving C and D—is resolved as well, perhaps years in the future.

*I* assume, perhaps erroneously, that B has not admitted to being a tortfeasor, because Colt omitted that information from the hypothetical. A is going to have to wait for a judicial determination that B is a tortfeasor before A can collect one thin dime from B, and that determination probably will not occur until P's trial against C and D, or C or D if one of them settles with P, or, if C and D both settle with P, at A's trial against B. As a practical matter, that is what occurred in this case, as Colt had to go to trial against Murphy to establish that Murphy was a tortfeasor, even though Jackovitch Tractor & Equipment Co., Empire Abrasive Equipment Corp., and Totem Equipment & Supply, Inc. had settled separately with P.

Once we base our decision on whether either interpretation encourages or discourages settlement, we have entered the realm of speculation. A party settles litigation for reasons that are specific to that party at that time.

---

5. The court presents one of Colt's examples to illustrate the "absurdity" of the result of Murphy's interpretation of the act. Slip Op. at p. 25–26, note 21. First, the court cannot know that the result is absurd without having full knowledge of all considerations that went into Colt's decision to settle for the amount it did. Second, the court continues to ignore the fact that nobody has forced Colt to settle. Colt settled voluntarily for its own reasons. It is Murphy that is being compelled to contribute.